**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 18-cv-0903-WJM-NRN

AMY DOMOKOS,

     Plaintiff,

v.

SHELTER MUTUAL INSURANCE COMPANY,

     Defendant.

---

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT, AND DENYING PLAINTIFF'S CROSS-MOTION FOR
PARTIAL SUMMARY JUDGMENT**

---

     Plaintiff Amy Domokos ("Domokos," although sometimes "Amy" to distinguish her from her parents, who play a role here) sues Shelter Mutual Insurance Company ("Shelter") for breach of insurance contract, common-law bad faith breach of insurance contract, and unreasonable delay or denial of insurance benefits in violation of Colorado Revised Statutes §§ 10-3-1115 and -1116.

     Currently before the Court is Shelter's Motion for Summary Judgment (ECF No. 51) and Domokos's Cross Motion for Summary Judgment (ECF No. 79), which is actually a cross-motion for partial summary judgment. For the reasons explained below, Shelter's motion is granted except as to Domokos's common-law bad faith claim, and Domokos's motion is denied. Therefore, this matter remains set for trial on Domokos's bad faith claim.

## I. LEGAL STANDARD

Summary judgment is warranted under Federal Rule of Civil Procedure 56 "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986). A fact is "material" if, under the relevant substantive law, it is essential to proper disposition of the claim. *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001). An issue is "genuine" if the evidence is such that it might lead a reasonable trier of fact to return a verdict for the nonmoving party. *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).

In analyzing a motion for summary judgment, a court must view the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). In addition, the Court must resolve factual ambiguities against the moving party, thus favoring the right to a trial. *See Houston v. Nat'l Gen. Ins. Co.*, 817 F.2d 83, 85 (10th Cir. 1987).

## II. BACKGROUND

The following facts are undisputed unless attributed to a party or otherwise noted.

### A. Removal of UM/UIM Coverage from the Altima Policy

In early 2015, Domokos's father, Glenn Domokos, was paying for a total of $750,000 in UM/UIM coverage from Shelter—$250,000 each for a Dodge Caravan, Ford Taurus, and Nissan Altima. (ECF No. 51 at 3–4, ¶¶ 5, 8–10; ECF No. 76 at 12,

¶¶ 52–53.)[1]  Around that time, Glenn called his usual Shelter agent, James Mosier, to see if he could reduce his premiums while still preserving $250,000 in UM/UIM coverage for each of the three vehicles, including the Nissan Altima, which was owned and driven by Amy Domokos.  (ECF No. 51 at 2, ¶ 2; ECF No. 76 at 12, ¶ 51; ECF No. 76-2 at 3.)

Mosier is "a contracted agent," not a Shelter employee.  (ECF No. 85-1 at 10.) He sells policies exclusively for Shelter (which allows Mosier to sell policies for one other company, although he does not), uses only Shelter computers and software, displays a Shelter sign on the outside of his office, includes "Shelter" on his business card and letterhead, and generally sets up his business so that anyone coming to his office knows they are working with a Shelter agent.  (*Id.*; ECF No. 88-1 at 4–5.)

According to Mosier's recollection at his deposition in this lawsuit, the conversation between himself and Glenn Domokos lasted "maybe 10 minutes, 15 minutes."  (ECF No. 85-1 at 4.)  Mosier explained to Glenn that he could remove the UM/UIM coverage on all but one of his policies and it would still apply to all three cars if the driver was "in the same household" as Glenn.  (*Id.* at 3–4.)  The specific words he remembers using are "living in the household."  (*Id.* at 5.)  Mosier also recalled saying "the only way you can keep this coverage [on drivers of all three vehicles] is by being a member of the household."  (*Id.* at 6.)

As will become clear below, Shelter's policy actually speaks of "relatives" who "reside" with the named insured.  "Household" appears in the policy, but not as a defined term.  Mosier testified that he generally explains the limitation in terms of

---

[1] All ECF page citations are to page number in the CM/ECF header, which does not always match the document's internal pagination, particularly in exhibits.

"household" because "if you tell [customers] something different, they don't remember that." (*Id.* at 5.)

Based on his explanation to Glenn Domokos, Mosier "assum[ed] [Glenn] knew that if somebody moved out, they would not have this coverage," but he does not remember if he used words explicitly to that effect. (*Id.* at 6, 8.) Later in his deposition, Mosier elaborated that "I assumed that he thought that [Amy] physically had to be in the household," and that his assumption arose from "the way we were talking," including "just the way it seemed like he was talking that she was physically in the household." (*Id.* at 8.) Since 2009, however, Amy had lived in a townhome in Parker, Colorado, rather than with her parents at their home in Littleton, Colorado—although her parents kept a bedroom for her in their Littleton house, in which she would stay four to five nights per month. (ECF No. 51 at 6, ¶¶ 27–29; ECF No. 76 at 9, ¶ 27.)

Shelter presents no evidence contradicting Mosier's recollection of his conversation with Glenn Domokos. Amy Domokos likewise does not challenge Mosier's account, except for two matters. Through a declaration from her father, she asserts, among other things, that: (1) the conversation with Mosier lasted "no more than 10 minutes," as compared to Mosier's memory of 10–15 minutes; and (2) "Mr. Mosier never [said] to me [Glenn] that this coverage was dependent on Amy living with me," in contrast to Mosier's recollection that he used the words "living in the household." (ECF No. 76-1 ¶¶ 4, 13.) Glenn does *not* deny that Mosier use the words "member of the household." Glenn says, rather, that

> Mr. Mosier did not tell me that Amy had to be living in my
> house in order for the UM/UIM coverage to apply.
> Mr. Mosier did not tell me that Amy would lose UM/UIM
> coverage if she moved out of my house. Mr. Mosier did not

> explain to me the meaning of household, or that if Amy lived
> somewhere other than my address, she would not be a
> member of my household.

(*Id.* ¶¶ 13–15.)

Regardless, as a result of the conversation, Mosier prepared new forms, including one in which Amy Domokos explicitly waived UM/UIM coverage on her Altima. (*Id.* at 4; ECF No. 51 at 3, ¶ 6; ECF No. 51-6 at 2.) Mosier has never spoken with Amy Domokos. (ECF No. 76-2 at 14.) The record does not make clear who asked Amy to sign this form.[2]

## B.    Relevant Policy Language

Updated policies issued for both the Altima and the Caravan (and presumably the Taurus too, although it is not relevant here). (ECF Nos. 51-5, 51-7.) The Altima policy listed the "named insureds" as Amy and Glenn, at Glenn's address in Littleton. (ECF No. 51-5 at 3.) The Caravan policy listed the "named insureds" as Glenn and Josephine, again at Glenn's address in Littleton. (ECF No. 51-7 at 3.) The policy numbers for both policies included a seven-digit code known as a "family number." (ECF No. 51 at 3, ¶ 10.)

For reasons that will become clear below, the Caravan policy is the focus of this dispute. Its declarations page appears as follows, showing Glenn and Josephine as the "named insureds," and, below that, the two of them alongside their daughter as "additional listed insureds":

---

[2] In his declaration, Glenn Domokos says that he signed the form (ECF No. 76-1 ¶ 17), but the form itself says it was signed by the "Named Insureds" under the Altima policy, namely, Amy and her mother, Josephine (ECF No. 51-6 at 2). On the other hand, Josephine is not a named insured under the Altima policy. (ECF No. 51-5 at 3.) These discrepancies are immaterial for present purposes.

Named Insured:
GLENN M DOMOKOS & JOSEPHINE DOMOKOS
13055 MERCURY DR
LITTLETON CO 80124-2946

**Policy Number:** 05-1-2970880-5
**Effective Date:** 08-28-2015 (12:01 AM CST)
**Expiration Date:** 02-28-2016 (12:01 AM CST)

**Agent:** JAMES A MOSIER
05-07784-11
8008 E ARAPAHOE CT
STE 100
CENTENNIAL CO 80112
303-770-3344

These Declarations are part of your policy and replace all prior Declarations.

| Vehicle | Vehicle ID |
|---|---|
| 2012 DODGE GRAND CARAVAN SXT | 2C4RDGCG7CR310881 |

| Additional Listed Insured |
|---|
| Glenn M Domokos; Josephine Domokos; Amy Domokos |

| Coverages | Limits and Deductibles | Endorsement Number | Premium |
|---|---|---|---|
| A. Bodily Injury | $250,000 Each Person    $500,000 Each Accident | | $97.91 |
| B. Property Damage | $100,000 Each Accident | | $52.72 |
| C. Medical Payments | $5,000 Each Person | | $20.85 |
| E. Uninsured Motorists | $250,000 Each Person    $500,000 Each Accident | | $105.76 |
| F. Collision | $200 Deductible | | $138.92 |
| G. Comprehensive | $100 Deductible | | $105.82 |
| Rental Reimbursement | $30 Daily | A-725.1-A | $11.70 |

(ECF No. 51-7 at 3.)[3]

The Caravan policy defines "named insured" to mean "any **person** listed in the

**Declarations** under the heading '**Named Insured**'.  **Persons** listed under other

headings are not **named insureds** unless they are also listed under the heading

'**Named Insured**'."  (ECF No. 51-7 at 8.)[4]

The definitions section does not define "additional listed insured."  That term

receives its meaning from the Caravan policy's liability coverages (bodily injury under

"Coverage A" and property damage under "Coverage B").  (*Id.* at 14.)  There, the

---

[3] No party has claimed that the headings with a shaded background (*e.g.*, "Vehicle," "Additional Listed Insured") are as difficult to read on the original policy as they are in the reproduction submitted for the record.

[4] All boldface in policy quotations is in original, and denotes defined terms.

persons entitled to coverage are broken into separate categories. "Category 2" applies to "**Relatives**" and "**Individuals** listed in the **Declarations** as an 'additional listed insured'." (*Id.*) "Relatives" means any person related to the named insured "by blood, marriage, or adoption, who is a **resident** of [the named insured's] household," where "resident" is defined derivatively from the definition of "reside," which means "to actually live in a location with the intent to make that place, and no other, one's primary, and permanent home." (*Id.* at 9.) "Additional listed insured" is not further defined. Per "Category 2," both relatives and additional listed insureds are covered "for **claims** resulting from their **maintenance**, **use**, or **operation**, of the **described auto**." (*Id.* at 9, 14.) "Described auto" means "the vehicle described in the **Declarations**" (*id.* at 7), *i.e.*, the Caravan.

UM/UIM coverage is "Coverage E" under the Caravan policy. (*Id.* at 19.) Coverage E applies to (1) the named insured, with no restriction on the vehicle the named insured is occupying at the time of the accident, (2) relatives (as defined above), again with no restriction on which vehicle the relative is occupying, and (3) anyone else "who sustains **damages** while **occupying** the **described auto** [*i.e.*, the Caravan] with **permission** or **general consent**." (*Id.*) In other words, consistent with the advice Mosier claims to have given Glenn Domokos, UM/UIM coverage does not extend beyond the named insureds or the Caravan itself unless the person claiming coverage is a "relative," *i.e.*, someone residing with the named insureds.

## C.    Amy Domokos's Accident and Shelter's Initial Response

The reader can probably see where this is headed. Later that same year—on October 25, 2015, specifically—Amy Domokos was in a collision while driving her Altima. (ECF No. 51 at 2, ¶¶ 1–2.) The following month, she submitted a UIM claim to

Shelter, asserting coverage as an additional listed insured.  (*Id.* ¶ 3; ECF No. 76-3 ¶ 2.)
She disavows claiming coverage under some other status.  (Id. ¶¶ 2–3.)

Shelter assigned one of its adjusters, Amanda Coon, to handle the claim.  (ECF
No. 51 at 2, ¶ 4.)  As Coon reviewed the claim, she noticed that "all of the individuals
insured under the Altima and Caravan Policies, *i.e.* Glenn, Josephine and Amy
Domokos, were members of the same household, because [the policies] were issued [to
Domokos] and her parents, respectively, at [Glenn and Josephine's Littleton address]
under the same family number."  (*Id.* at 5, ¶ 21.)  Coon therefore "presumed" that Glenn,
Josephine, and Amy "were members of the same household."  (*Id.*)  Coon explained at
her deposition that this presumption led her to conclude that Amy was entitled to UIM
coverage under the Caravan policy.  (*Id.* ¶ 22.)

Domokos disputes that this was the *only* reason Coon came to that conclusion.
Domokos emphasizes that Coon's contemporaneous claim notes do not contain any
explanation of how she decided that coverage was available.  (ECF No. 76 at 9, ¶ 22.)
Domokos also points to a portion of Coon's deposition testimony where she "testified
that [her] determination was influenced by Amy being listed as an additional listed
insured on the Declarations Page."  (*Id.*)  The relevant deposition testimony is as
follows:

> Q.  So what did you do when you first received the claim to
>     determine coverage?
>
> A.  I looked at the declarations pages, and I saw that she
>     was an additional listed insured.  It appeared to me that
>     she was living in the household at the time.  So that is
>     where my coverage determination came from.

(ECF No. 51-4 at 3.)  Finally, Domokos notes that Coon reviewed a police report
regarding the car accident, and that police report showed Domokos's address in Parker.

(ECF No. 76 at 11, ¶ 43.)  In any event, from her determination of coverage until this lawsuit was filed, Coon "handled the claim under the assumption that UIM coverage was available to Ms. Domokos under the Caravan Policy issued to her parents."  (ECF No. 51 at 6, ¶ 23.)

In June 2016, Domokos settled with the driver that caused the accident.  (*Id.* ¶ 24.)  She then turned her attention to UIM benefits.  The negotiations in this regard apparently got bogged down in a dispute over whether Domokos had developed a stutter as a result of the accident.  (*See* ECF No. 76 at 3–4.)[5]  Shelter's made offers of $20,000 and then $75,000.  (ECF No. 76-6 at 1–4.)  Explaining the $75,000 offer in a February 2018 letter, Coon stated,

> We have based our settlement evaluation on the medical records and bills presented by your office [*i.e.*, Domokos's attorney's office] and lost wages.  The medical records state that they do not believe [the] stutter is related to this accident.  Furthermore, we feel that some of these complaints were caused by the second accident on January 4, 2016.

(*Id.* at 5.)[6]  Enclosed with that letter was a $75,000 check (*id.*), although the record does not state whether Domokos ever cashed that check.

Domokos filed this lawsuit in April 2018, claiming entitlement to the full $250,000 policy limits under the Caravan policy's UIM coverage.  (ECF No. 1 ¶¶ 6, 80.)  Both her

---

[5] Domokos's allegations about her stutter are not presented in any formal statement of material facts (in violation of WJM Revised Practice Standard III.E.3–6) but are instead presented in narrative form in an elaborate (7-page) introductory section to her response brief. (*See* ECF No. 76 at 1–8.)  Thus, Shelter has not received an opportunity specifically to admit or dispute these allegations.  However, correspondence in the record from Coon shows it is beyond dispute at least that Shelter questioned the connection between the accident and Domokos's stutter.  (*See* ECF No. 76-6 at 5.)  Accordingly, in these specific circumstances, the Court excuses Domokos's failure to comply with the Revised Practice Standards.

[6] The record contains nothing further about the January 2016 accident.

original complaint and the currently operative complaint (the Second Amended Complaint) set forth four causes of action: (1) "Underinsured Motorist Benefits"; (2) breach of contract, apparently somehow separate from the first cause of action; (3) unreasonable delay/denial of insurance benefits in violation of Colorado Revised Statutes §§ 10-3-1115 and -1116; and (4) common-law bad faith breach of insurance contract. (*See* ECF No. 83 at 8-11.)

### III.  ANALYSIS

Shelter moves for summary judgment in its favor on the first and second causes of action, asserting that the Caravan policy does not provide UIM coverage to Domokos. (ECF No. 51 at 7–9.)  And, in light of the lack of coverage, Shelter argues that the unreasonable delay/denial and bad faith claims necessarily fail. (*Id.* at 9–10.)  Domokos cross-moves for partial summary judgment, arguing under various legal theories that the Caravan policy must be construed to provide coverage. (ECF No. 79 at 1–2; *see also* ECF No. 76 at 15–36.)

Notably, Domokos nowhere argues that the Caravan policy (or any other policy), by its terms, provides UIM coverage to her.  She argues only under the facts of this case that Colorado law requires UIM coverage to be deemed to exist.  Accordingly, it is undisputed that the Caravan policy, by its terms, provides no UIM coverage to Domokos.  And in that light, the questions before the Court are now twofold.  First, does any principle of Colorado law require Shelter to provide UIM coverage anyway?  Second, what is the effect of the answer to the first question (whether in favor of Domokos or Shelter) on Domokos's causes of action for unreasonable delay/denial and bad faith?  The Court will address these questions in turn.

**A.      Reasonable Expectations**

Domokos's primary argument that UIM coverage must exist in these circumstances relies on Colorado's "reasonable expectations doctrine."

1.      Reasonable Expectations Generally

The Colorado Supreme Court has summarized the reasonable expectations doctrine as follows:

> Given insurance policies' unique nature, which includes significant potential for insurers to take advantage of or mislead insureds, such policies are subject to heightened scrutiny, including the doctrine of reasonable expectations, which obligates insurers to clearly and adequately convey coverage-limiting provisions to insureds.  In Colorado, the reasonable expectations of insureds have succeeded over exclusionary policy language in two main situations:
> (1) where an ordinary, objectively reasonable person would, based on the language of the policy, fail to understand that he or she is not entitled to the coverage at issue; and
> (2) where, because of circumstances attributable to an insurer, an ordinary, objectively reasonable person would be deceived into believing that he or she is entitled to coverage, while the insurer would maintain otherwise.

*Bailey v. Lincoln Gen. Ins. Co.*, 255 P.3d 1039, 1048–49 (Colo. 2011).  The Court will address these principles in greater detail below.  First, however, the Court must address Shelter's argument that the reasonable expectations doctrine fails from the outset.

2.      The Effect of *Hansen*

Shelter contends that the reasonable expectations doctrine can never apply here in light of *American Family Mutual Insurance Co. v. Hansen*, 375 P.3d 115 (Colo. 2016) ("*Hansen*").  (*See* ECF No. 85 at 8–9.)  In that case, it was undisputed that the plaintiff, Jenny Hansen, was not a "named insured" under the relevant auto policy.  *Id.* at 120.  However, sometime before the auto accident in question, an agent for the insurance company, American Family had given Hansen a lienholder statement showing a named

11

insured of "Davis, Jenny"—Davis was Hansen's stepfather's surname, although not a surname Hansen had ever used. *Id.* at 117. After a car accident, she received from the same agent another lienholder statement listing "Hansen, Jenny" as the named insured. *Id.* at 118. But, as it turned out, the only named insureds on the policy itself were Hansen's mother and stepfather. *Id.* at 117 & n.1. Hansen argued successfully in the trial court that the lienholder statement created an ambiguity in coverage that must be resolved in her favor, and the Colorado Court of Appeals agreed. *Id.* at 119–20. But the Colorado Supreme Court reversed.

As to Hansen's ambiguity argument, the Colorado Supreme Court invoked the doctrine that a contract which is not ambiguous on its face cannot be declared ambiguous by looking at extrinsic evidence (such as the lienholder statement). *Id.* at 120–21. And, on the facts of that case, the "named insured" section unambiguously listed only Hansen's mother and stepfather. Therefore, the lower courts erred in finding an ambiguity and construing it against American Family. *Id.* at 121.

But Hansen also argued for affirmance on alternate ground, namely, "even if the insurance contract itself is unambiguous, ambiguity nevertheless arises under the doctrine of reasonable expectations." *Id.* at 122. Drawing on *Bailey*, the Colorado Supreme Court responded that "the doctrine of reasonable expectations applies only to 'the reasonable expectations *of insureds*,' and thus only after it is determined that the claimant is an insured." *Id.* (quoting *Bailey*, 255 P.3d at 1054) (citation omitted; emphasis in original). "In this case," the court said, "Hansen cannot rely on her reasonable expectations to establish her identity as the named insured when [the relevant] declaration page unambiguously identifies [her mother and stepfather] as the

insureds." *Id.*

Relying on *Hansen*, Defendant argues that Plaintiff

> is not a 'named insured' on the Caravan Policy.  Further, she
> does not qualify as an 'insured' for this accident under the
> express terms of that policy (as she was also not driving the
> covered vehicle and is not a resident-relative of the
> insureds).  Accordingly, under the rule of *Hansen*, she is not
> entitled to invoke the doctrine of reasonable expectations
> . . . .

(ECF No. 85 at 8–9.)  The Court disagrees with Defendant's interpretation of *Hansen*.

The key phrase in Defendant's argument is "she does not qualify as an 'insured' *for this accident*" (emphasis added).  Unlike the facts of *Hansen*, Defendant cannot argue that Plaintiff is not an insured *at all*—indisputably, her name appears on the declarations page (precisely where the Colorado Supreme Court was looking in *Hansen*) under the heading "additional listed insured."  So Defendant must argue that she is not an insured for purposes of the accident in question—which is just another way of saying that there is no coverage under the circumstances.

*Hansen* did not establish that courts must engage in an accident-by-accident inquiry into whether a person is entitled to coverage before reasonable expectations might apply.  Indeed, such an approach would swallow the reasonable expectations doctrine because its purpose is to provide coverage that is not, strictly speaking, in the policy.  In other words, no one is an insured "for this accident" who needs to rely on the reasonable expectations doctrine to obtain coverage.

Accordingly, *Hansen* does not prevent this Court from finding coverage if the reasonable expectations doctrine applies.  The Court therefore must ask whether either of the two forms of the reasonable expectations doctrine requires coverage here.

3.      Language of the Policy

      a.      *General Principles*

Again, the first scenario in which the reasonable expectations doctrine applies is "where an ordinary, objectively reasonable person would, based on the language of the policy, fail to understand that he or she is not entitled to the coverage at issue." *Bailey*, 255 P.3d at 1048–49. "This manifestation of the doctrine of reasonable expectations applies when policy coverage-provisions may not be ambiguous in a technical sense, and hence subject to the rule that ambiguities must be construed against the drafter, but are ambiguous from the perspective of an ordinary reader." *Id.* at 1050.

Colorado courts have not elaborated on what it means for coverage provisions to "not be ambiguous in a technical sense" yet still be "ambiguous from the perspective of an ordinary reader." But certain cases have contrasted the ordinary reader with persons who are "highly sophisticated in the art of reading insurance policies," *State Farm Mut. Auto. Ins. Co. v. Nissen*, 851 P.2d 165, 167 (Colo. 1993), and, similarly, "those who are experts in the construction of insurance contracts or [who have] a clear understanding of the legal effects of specific language," *Simon v. Shelter Gen. Ins. Co.*, 842 P.2d 236, 240 (Colo. 1992). With language such as this, one might think that questions of reasonable expectations should presumptively go to a jury, which is much more likely than a judge to approach an insurance contract as an "ordinary reader." But the parties have not cited any Colorado authority for the idea that a jury may resolve a reasonable expectations dispute, nor has any party argued that the dispute currently before the Court raises a jury question. Therefore, when the Colorado Supreme Court says "the question of whether an ambiguity exists is always an objective test," *Bailey*, 255 P.3d at 1051, the Court understands "objective test" to mean "question of law."

In addition, the Court notes that the question under this prong of the reasonable expectations doctrine is "how an ordinary, objectively reasonable insured would read the whole policy," *id.*, so isolated instances of ordinary-reader ambiguity are likely not enough, by themselves, to justify a ruling in the insured's favor. On the other side of the same coin, however, the question is not whether the insurance contract is completely free from ordinary-reader ambiguity, but whether such ambiguity exists about the coverage in dispute. *See id.* at 1043, 1048–53 (repeatedly describing this application of the reasonable expectations doctrine as an inquiry into whether the ordinary reader would "fail to understand that he or she is not entitled to the coverage at issue"); *id.* at 1051 ("the question of whether certain coverage exists" must be "susceptible to more than one reasonable interpretation" (internal quotation marks omitted)).[7]

b.   *Application to the Caravan Policy*

Domokos's argument for ordinary-reader ambiguity is substantially as follows:

> . . . Glenn, Josephine, and Amy . . . are *together* named [on the declarations page] as 'additional listed insured[s],' and UIM coverage of $250,000 is among the coverages listed directly below their three names. . . . [¶] A person of ordinary intelligence would look at this Declarations Page and reasonably believe that those that are named as insureds (Glenn, Josephine, and Amy) are each entitled to the UIM coverage listed whenever they might be injured by an underinsured motorist . . . .

---

[7] At least one reasonable expectations case has focused on whether an insurance policy came into being in the first place, rather than on whether specific coverage existed. *See Leland v. Travelers Indemnity Co. of Illinois.* 712 P.2d 1060, 1063 (Colo. App. 1985), *cited with approval in Bailey*, 255 P.3d at 1055–56; *see also Brookshire Downs at Heatherridge Condo. Ass'n, Inc. v. Owners Ins. Co.*, 366 F. Supp. 3d 1224, 1229–30 (D. Colo. 2019) (applying this version of reasonable expectations to the question of whether an insurance contract remained enforceable after its internal statute of limitations had expired). However, this scenario is not presented here, and, in any event, this application of reasonable expectations arises from the "deception" manifestation of the doctrine (*see* Part III.A.4, below), not the "language of the policy" manifestation.

* * *

> . . . How can all three insureds belong to [the 'additional listed insured'] category but not enjoy the same coverages? Glenn and Josephine enjoy the $250,000 in UIM coverage wherever they go but Amy does not? If the categories are truly different, then only Amy and Amy alone should have been listed as an additional insured.

> . . . Amy is literally named as an "insured" on the Declarations Page, [so] any reasonable person would reasonably conclude that she is therefore a "named insured," as opposed to someone who is not *named* in the policy but becomes insured by some other mechanism (i.e. driving the Caravan with permission).

(ECF No. 76 at 19, 20, 21 (emphasis in original).)[8] Domokos also repeatedly quotes excerpts from Mosier's deposition in which he states that he does not understand the distinction between a named insured and an "additional insured," and he does not know where the policy explains that difference. (*Id.* at 4–5, 21–22, 31.)[9]

Domokos's argument ignores the governing precepts for a language-of-the-policy reasonable expectations argument. It focuses almost exclusively on the declarations page, rather than the whole policy. *Cf. Bailey*, 255 P.3d at 1051. It also points out a potentially confusing aspect of the policy—naming Glenn and Josephine as both "named insureds" and, alongside Amy, as "additional listed insureds"—without

---

[8] Interwoven with this argument are additional arguments drawing on background expectations (from statutes and court decisions), Glenn Domokos's intentions, and Shelter's alleged failure to draw attention on the declarations page to the lack of UIM coverage for "additional listed insureds." These are allegations of "deception," as that term is used in the second manifestation of the reasonable expectations doctrine, and will be addressed when the Court reaches that form of reasonable expectations in Part III.A.4, below. They are not allegations of ordinary-reader ambiguity under the language of the policy itself.

[9] Domokos somewhat exaggerates Mosier's testimony. Mosier—who has forty-eight years' experience in the insurance industry and is therefore likely to be close to seventy years old—did not bring his glasses to his deposition. (ECF No. 85-1 at 11–12.) He did not want to opine on policy language without re-reading the policy, and he did not feel comfortable re-reading the policy without his glasses. (*Id.*)

explaining how someone reading the whole policy would be misled by that oddity and therefore "fail to understand" that an additional listed insured "is not entitled to the coverage at issue," *i.e.*, UIM coverage.  *Id.* at 1048–49.

Domokos admits that Coverage E, governing UIM insurance, does not "reference or define 'additional listed insured.'"  (ECF No. 76 at 20.)  Domokos presents this as an argument for ordinary-reader ambiguity, but it is the opposite.  If an ordinary reader wishes to know whether an additional listed insured is entitled to UIM benefits—the coverage at issue—then the ordinary reader surely must read Coverage E (not just the declarations page).  The reader would then see that UIM coverage extends to named insureds, relatives, and anyone else occupying the described auto with permission or general consent, but not to additional listed insureds.  (ECF No. 51-7 at 19; *see also* Part II.B, above.)  So the ordinary, reasonable, non-technical presumption is that additional listed insureds are not covered for UIM benefits unless they are somehow also within the three categories that *are* insured.

Continuing further, it is well within the competence of an ordinary reader to look up the definitions of the three UIM-insured categories and see that they have no necessary connection to the additional listed insured category.  Domokos decries the policy definition of "named insured" as "technical" and "contrived" (ECF No. 76 at 20–21), but it is actually straightforward: "any **person** listed in the **Declarations** under the heading '**Named Insured**'.  **Persons** listed under other headings are not **named insureds** unless they are also listed under the heading '**Named Insured**'" (ECF No. 51-7 at 8).  As for "relative," the definition is equally straightforward: "an **individual** related to **you** [*i.e.*, the named insured] by blood, marriage, or adoption, who is a

**resident** of **your** household." (*Id.* at 9.) Domokos does not argue otherwise. Domokos similarly does not argue that the third category (everyone else using the "described auto" with permission or general consent) is ambiguous. So, having examined the extent of UIM coverage and having verified that additional listed insureds are not among the three categories of persons to whom UIM coverage extends, it is hard to see how an ordinary reader could consider Coverage E ambiguous.

Of course, at this point, an ordinary reader would naturally ask, "Where *does* an 'additional listed insured' get any benefits?" Reading beyond the declarations page, the reader would see that "additional listed insured" appears in one other location, regarding Coverages A and B. And if that is the only place where the policy describes benefits for additional listed insureds, then the ordinary, non-technical presumption must be that additional listed insureds only qualify for Coverages A and B (unless they happen to fall in another category as well, like "relative").

Accordingly, the manifestation of the reasonable expectations doctrine that looks for ordinary-reader ambiguity under the language of the policy as a whole does not entitle Domokos to UIM coverage.

      4.    <u>Deception Attributable to the Insurer</u>

      a.    *General Principles*

Even where there is no ordinary-reader ambiguity, "Colorado courts have honored the reasonable expectations of an insured where circumstances attributable to an insurer have deceived ordinary, objectively reasonable insureds into believing that they are entitled to coverage, while the insurer would maintain they do not enjoy such coverage." *Bailey*, 255 P.3d at 1053. The Colorado Supreme Court fully understands that this application of the doctrine "deviate[s] from several well-established rules

governing the construction of contracts, including the tenet that a party is presumed to know the content of a contract signed by him, the precept that contracts which are free from ambiguity are to be enforced as written, and the maxim that specific clauses control the effect of general clauses." *Id.* at 1054 (internal quotation marks omitted). In other words, this form of reasonable expectations is highly distinct from the previous form (which assumes that the insured has read the whole policy).

All that said, "the doctrine of reasonable expectations does not contemplate the expansion of coverage on a general equitable basis." *Id.* (internal quotation marks omitted).

> In order for reasonable expectations to prevail over exclusionary policy language, an insured must demonstrate through extrinsic evidence that its expectations of coverage are based on specific facts which make these expectations reasonable. These specific facts must show that, through procedural or substantive deception attributable to the insurer, an objectively reasonable insured would have believed he or she possessed coverage later denied by an insurer.

*Id.* (internal quotation marks and citation omitted; alterations incorporated).

Neither procedural nor substantive deception requires actual deception. "Procedural deception" generally refers to "fail[ing] to adequately communicate the coverage exclusion to the [insured]." *Id.* "Substantive deception," as the Colorado Supreme Court has used that term, is probably better termed "justifiable misunderstanding." It usually refers to background facts about the insurance transaction that make it reasonable for the insured to believe he or she is buying a particular coverage. *See id.* Failing to write a policy containing that coverage is "substantive deception attributable to the insurer," *id.*, because "an insurance company is expected to know the policyholder's objectively reasonable expectations of insurance

coverage and to sell a policy suitable for the policyholder's needs," Eugene R. Anderson & James J. Fournier, *Why Courts Enforce Insurance Policyholders' Objectively Reasonable Expectations of Insurance Coverage*, 5 Conn. Ins. L.J. 335, 346 (1998), *quoted with approval in Bailey*, 255 P.3d at 1054.

        b.    *Mosier's Status as Agent*

All "deception," whether procedural or substantive, must be "attributable to the insurer" for the reasonable expectations doctrine to apply. *Bailey*, 255 P.3d at 1054. Some of Domokos's reasonable expectations arguments rely on attributing Mosier's actions to Shelter. (*See* ECF No. 76 at 29–31.)

Shelter, in its reply in support of summary judgment, argues that Mosier's actions are not attributable to it. Shelter says that Domokos's "contention that UIM coverage must be afforded to her because that was the intent of the parties is in error" because "her reliance on Mr. Mosier's testimony on this point overlooks the fact that he is not a party to this case or designated to speak on behalf of Shelter." (ECF No. 85 at 11.)

This argument—on which Shelter does not elaborate—is curiously phrased. Shelter never denies Mosier's agency status, and does not invoke any principle of agency law to distance itself from Mosier's words and deeds. Shelter instead points out that Mosier is not a party to this case (true, but irrelevant) and that he "is not" (present tense) "designated to speak" on Shelter's behalf. This seems to be a rephrased version of an argument earlier in the same brief that certain deposition testimony given by Mosier (not relevant to the present issue) has less force than Domokos claims because "Mr. Mosier is not an employee of Shelter and was not testifying as its designee." (*Id.* at 2, ¶ 11.) Thus, it is not clear that Shelter truly means to argue that it cannot be bound by Mosier, or that Mosier's actions cannot create "deception" that is "attributable to"

Shelter.

Assuming, however, that Shelter does mean to make such an argument, the Court rejects it for two reasons. First, Shelter entirely fails to develop it. "[F]ailure to develop . . . arguments adequately in the district court [results] either [in] forfeit[ure] (if her failure was unintentional) or waive[r] (if her failure was intentional) . . . ." *McKissick v. Yuen*, 618 F.3d 1177, 1189 (10th Cir. 2010). Second, the Court is confident that the Colorado Supreme Court, if presented with the question, would hold that an exclusive agent such as Mosier, although an independent contractor, can nonetheless create deception attributable to the insurer.[10] If the case were otherwise, an insurer could insulate itself entirely from the reasonable expectations doctrine by conducting all of its transactions through non-employee agents. The Court predicts that the Colorado Supreme Court would not permit this result.

Accordingly, Mosier's non-employee status does not prevent him from creating "deception" that is "attributable to" Shelter. The Court therefore turns to the alleged deception in this case.

c. *Substantive Deception*

As stated above, substantive deception generally refers to background facts that reasonably influence an insured's expectation of coverage. *Bailey*, 255 P.3d at 1054. For example, substantive deception was found in a rental car physical damage waiver because it left the renter liable if damage was caused by driving while intoxicated,

---

[10] Other states might refer to Mosier as a "captive agent." *See Miller v. Mill Creek Homes, Inc.*, 97 P.3d 687, 689 n.1 (Or. App. 2004) ("A 'captive agent' is an agent who generally sells only one company's policies to insureds."). Two Colorado cases have used the term "captive agent," but neither has given it any legal meaning. *See Hansen*, 375 P.3d at 117; *In re Marriage of Graff*, 902 P.2d 402, 404 (Colo. App. 1994).

contrary to a reasonable expectation at the time under Colorado's (since repealed) no-fault regime that insurance provided coverage regardless of fault. *See Davis v. M.L.G. Corp.*, 712 P.2d 985, 986–87 (Colo. 1986); *see also Bailey*, 255 P.3d at 1054 (clarifying the substantive deception at issue in *Davis*).

Domokos attempts to make several *Davis*-like argument here, but none of them establish substantive deception.

(i)      Statutory Definition of "Insured"

Domokos first points out that "insured" is defined by statute as "the named insured, relatives of the named insured who reside in the same household as the named insured, and any person using the described motor vehicle with the permission of the named insured." Colo. Rev. Stat. § 10-4-601(5). Domokos then (apparently) accuses Shelter of violating the statute "by creating a new category ('additional listed insured') outside of the law and a technical, contrived definition of 'named insured,' both of which are misleading." (ECF No. 76 at 20–21; *see also* ECF No. 88 at 9–10.) There are at least four problems with this argument.

First, Domokos fails to mention that the statutory definition of "insured" is a definition for purposes of the auto insurance statute. *See* Colo. Rev. Stat. § 10-4-601, introductory sentence ("As used in this part 6, unless the context otherwise requires . . . ."). Nowhere does it claim to establish the definition that insurance companies must adopt.

Second, if Shelter has somehow violated the statute, it is unclear why Domokos does not make that argument directly. "If a policy provision violates public policy by attempting to dilute, condition, or limit statutorily mandated coverage then it may be void and unenforceable." *DeHerrera v. Sentry Ins. Co.*, 30 P.3d 167, 173 (Colo. 2001). Yet

Domokos only raises the alleged statutory violation only as evidence of substantive deception.

Third, Domokos is not an "insured" under the statutory definition, because she is neither a named insured (which the statute leaves undefined), a resident relative, nor a permissive driver of the described motor vehicle (the Caravan, in this case).

Fourth, as already stated, the policy definition of "named insured" is straightforward, not misleading. The policy contains no definition for "additional listed insured," but it clearly sets forth that additional listed insureds are entitled to Coverages A and B when using the Caravan.

Thus, no substantive deception arises out of any expectations created by the statutory definition of "insured" or any conduct of Shelter supposedly contrary to those expectations.

(ii)     Legislative Intent

Domokos next argues that insureds have a reasonable expectation of broad UM/UIM coverage because "[t]he Legislature has declared as much: the UM/UIM statute exists 'to assure the widespread availability to the insuring public of insurance protection against financial loss caused by negligent financially irresponsible motorists.' Ch. 91, sec. 1, 1965 Colo. Sess. Laws 333." (ECF No. 76 at 26.) However much legislative intent (not actually embodied in a statute) can create enforceable *public* expectations, this is nowhere near the expectation in the *Davis* decision that arose from the no-fault regime. Assuming the public has an expectation of widespread UM/UIM coverage, it has nothing to do with whether that coverage exists in a particular case. Otherwise, UM/UIM coverage would always exist.

This argument therefore demonstrates no substantive deception.

Domokos points to the Colorado Supreme Court's holding in *DeHerrera*, 30 P.3d at 175, that "the [UM/UIM] statute provides coverage for *persons*; it does not place geographical limits on coverage and does not purport to tie protection against uninsured motorists to occupancy in any kind of *vehicle*" (emphasis in original). "Thus," she says, "the reasonable person would expect such coverage to apply regardless of what vehicle, pedals, or shoes they occupied." (ECF No. 76 at 26.)

*DeHerrera* was about a policy term that limited UM/UIM benefits to someone injured while occupying a car, to the exclusion of (among other things) injuries on a motorcycle. 30 P.3d at 169–70. The Colorado Supreme Court noted that "UM/UIM coverage, if not waived by the named insured, must protect 'persons insured thereunder who are legally entitled to recover damages from owners or operators of uninsured motor vehicles.'" *Id.* at 175 (quoting Colo. Rev. Stat. § 10-4-609(1)). And, in that context, it held that the statute covers persons, irrespective of what type of vehicle they are driving. *Id.* Thus, the policy exclusion based on riding a motorcycle was invalid. *Id.* at 176.

As explained in Part III.B, below, addressing a separate "persons insured thereunder" argument that Domokos raises, the phrase does not refer to any person named as an "insured" under a policy in any sense. It refers only to those who would be covered under the liability portion of the policy for a particular accident. Thus, neither *DeHerrera* nor its construction of the phrase "persons insured thereunder" in the UM/UIM statute creates any enforceable expectations of *being* the "person insured thereunder." At most, it creates the reasonable expectation that *if you are* such a person, your coverage inheres in you personally, regardless of what you are driving or

riding (if anything).  Accordingly, *DeHerrera* cannot be the basis of any sort of

substantive deception relevant to this case.

### d.    *Procedural Deception*

Another problem in the *Davis* case was that the two-page rental damage waiver

seemed designed to discourage renters from reading it and learning that damage from

drunk driving was not actually covered.  *See* 712 P.2d at 986, 992.  As described in

*Bailey* (which was the first to identify *Davis* as a case involving procedural deception, in

addition to substantive deception):

> On the front side of the rental agreement, three different
> options were listed for reducing the lessee's responsibility for
> physical damage occurring to the rental car, one limiting the
> amount to $500, another to $350, and the last, the physical
> damage waiver, absolving the lessee from all responsibility.
> The prohibition against drunk-driving did not appear in this
> section, or even on this page, but on the reverse side of the
> agreement, in small, off-color, light grey type that was
> "almost impossible" to read.  The lessor's rental agent had
> never seen any lessee read the reverse side of the
> agreement.  Hence, the manner in which the lessor
> conveyed the exclusions amounted to a "concerted effort" to
> discourage persons, including the lessee, from reading
> about and discovering the exclusions.  Further, the
> exceptions to the physical damage waiver were never
> brought to the lessee's attention, even though other clauses
> relating to the lessee's responsibility were.  All these actions
> were [procedural deception] directly attributable to the
> lessor.

255 P.3d at 1054–55 (citations omitted).  In a similar vein, *Bailey* described other

procedural deception cases in which coverage-limiting conditions were not called to the

insured's attention in clear and unequivocal language.  *Id.* at 1055.

As with substantive deception, Domokos tries to fit her procedural deception

arguments into these molds, but they do not fit.

(i)     Failure to Call Attention to Limiting Conditions

Domokos first argues that the Caravan policy's declarations page does not adequately inform the reader that additional listed insureds do not have UM/UIM coverage. The Court need not decide whether Domokos properly interprets the Colorado Supreme Court cases addressing this subject because Domokos cites no authority for the notion that the declarations page, or any particular document, is the means through which coverage-limiting conditions must be called to the insured's attention.

Here, it is beyond reasonable dispute that Mosier adequately informed Glenn Domokos that UM/UIM coverage could be withdrawn on all but the Caravan policy but still cover him, Josephine, and Amy *only if* they were members of the same household. Even taking the facts in the light most favorable to Domokos, and therefore assuming that Mosier never said "living in the household," it is still undisputed that Mosier explained that Amy's UM/UIM coverage turned on "household" membership. (*See* Part II.A, above.)

An ordinary insured could not reasonably misunderstand "household" to mean anything other than its common meaning: "those who dwell under the same roof and compose a family[;] *also*: a social unit composed of those living together in the same dwelling." Merriam-Webster Online, *s.v.* "household," at https://www.merriam-webster.com/dictionary/household (last accessed Sept. 19, 2019). The fact that Mosier did not elaborate on the meaning of "household," as Glenn Domokos claims, is not evidence of some sort of ambiguity or failure to clearly express coverage limitations. To the contrary, it is further evidence that Glenn had no reason to think of "household" as

anything different than what it normally means.[11]

Finally, if Glenn had a question about whether Amy's four or five nights per month sleeping at his and Josephine's house in Littleton qualified as "household," no fault can be attributed to Mosier or Shelter. Nothing in the record shows that Mosier or Shelter knew that this was a circumstance that needed to be addressed.[12]

Consequently, there was no procedural deception based on failure to properly call out coverage limitations.

(ii)     Efforts to Discourage Policyholders from Reading the Policy

Finally, Domokos asserts that "Shelter made a concerted effort to discourage policyholders from reading the fine print exclusions, buried in the policy." (ECF No. 76 at 28.) However, unlike the rental damage waiver in *Davis*, there is no "fine print" or off-color type in the Caravan policy. All of the text is black and approximately the same size. Moreover, as the Court has already explained in the context of the language-of-the-policy species of the reasonable expectations doctrine, the question whether UM/UIM coverage extends to additional listed insureds is not difficult to answer. (*See*

---

[11] As described in Part III.A.4.c(i), above, Domokos claims that the Colorado statutory definition of "insured" potentially leads to substantive deception here. However, this definition encompasses "the named insured, relatives of the named insured *who reside in the same household* as the named insured, and any person using the described motor vehicle with the permission of the named insured." Colo. Rev. Stat. § 14-4-601(5) (emphasis added). Thus, if any reasonable expectations arise from the statute, they at least include an understanding that "household" is tied to residence.

[12] Notably, Domokos has not requested reformation of the policy to conform to what she represents to be Glenn Domokos's and Mosier's shared intent. *Cf. Hansen*, 375 P.3d at 122 ("Importantly, a finding of no ambiguity does not leave Hansen without a remedy. Indeed, she could have sought reformation of the contract to accurately reflect the intention of the parties."). Presumably, Domokos brought no such claim because any direct inquiry into Glenn's intent—as opposed to a reasonable expectations inquiry, which tends to ignore the insured's true subjective intent—would reveal that Glenn understood the risk he was taking by limiting UM/UIM coverage to those in the "household."

Part III.A.3, above.)  Thus, there is no procedural deception based on the format or structure of the policy.

*  *  *

For all of the foregoing reasons, Domokos's arguments under the reasonable expectations doctrine fail.

## B.    Effect of § 10-4-609 and *McMichael*

Domokos alternatively argues that the Caravan policy violates Colorado public policy if it extends liability and property damage benefits (Coverages A and B) to additional listed insureds but does not likewise extend UM/UIM benefits (Coverage E). (ECF No. 76 at 31–33.)  This argument rests on the Colorado statute governing UM/UIM insurance, and a Colorado Supreme Court case interpreting the statute, *Aetna Casualty & Surety Co. v. McMichael*, 906 P.2d 92 (Colo. 1995) ("*McMichael*").

The relevant statutory language says that an insurance company may not issue liability coverage (in this case, Coverages A and B) unless the policy also includes coverage against uninsured and underinsured motorists to "persons insured thereunder" (although "the named insured may reject such coverage in writing").  Colo. Rev. Stat. §10-4-609(1)(a), (4).  The question in *McMichael* was the meaning and effect of "persons insured thereunder."

The injured party in *McMichael* worked for a road construction company and was using his employer's truck as a barrier to protect him on the highway as he worked outside the vehicle, sawing concrete joints.  906 P.2d at 94.  He was nonetheless struck by a car, and the at-fault driver's liability insurance was not enough to cover his injuries. *Id*.  He therefore made a claim on the UM/UIM coverage in the insurance policy covering his employer's vehicles.  *Id*.  The relevant UM/UIM language only covered him

if he was "'occupying' a covered 'auto.'" *Id.* By contrast, the liability portion of the policy covered him "while *using* with [his employer's] permission a covered 'auto.'" *Id.* at 95 (emphasis added). In any event, because he was claiming UM/UIM benefits and was working outside of the vehicle at the time of the accident (*i.e.*, not "occupying" it), the insurance company denied coverage. *Id.* at 95.

The dispute proceeded to court, where the injured party argued that "persons insured thereunder" in the UM/UIM statute refers to persons insured under the liability portion of an automobile policy, and the statute thus required that persons insured against liability also be insured against uninsured or underinsured motorists unless the named insured waived that coverage in writing. *Id.* at 95–96. Because his employer never waived UM/UIM coverage—indeed, such coverage was included, albeit defined more narrowly than liability coverage—he argued that the policy's failure to extend UM/UIM coverage to the same extent as liability coverage was a violation of statute and therefore void. *Id.*

The Colorado Supreme Court agreed:

> Read within the context of section 10-4-609(1), the phrase "for the protection of persons insured thereunder" means that insurers must provide UM/UIM coverage for the protection of persons insured under the liability policy that the insurer is issuing. The word "thereunder" refers back to the liability policy that is being delivered or issued. "Persons insured thereunder," accordingly, refers to persons insured under the liability policy. Thus, under the plain meaning of section 10-4-609(1), insurers must provide UM/UIM coverage for all individuals covered under the liability provision of the policy unless the named insured refuses such coverage in writing.

*Id.* at 97.

Applying that holding the facts before it, the Colorado Supreme Court referred

back to the relevant policy's liability coverage—which required "use" of a "covered 'auto'" with the named insured's (*i.e.*, the employer's) permission—and stated that the injured party, "to the extent that he was a permissive user of a covered vehicle, is an insured under the liability coverage section." *Id.* at 99–100. To conform the policy to the UM/UIM statute, the court construed it to likewise "provide UM/UIM coverage for permissive users of covered autos," even though the literal policy language would only cover those "occupying" the covered auto. *Id.* at 101. Finally, the court concluded that using the truck as a protective barrier to do the employer's work qualified as "using" the truck within the meaning of the policy. *Id.* at 101–03. Thus, by virtue of the UM/UIM statute, UIM benefits necessarily extended to the injured party. *Id.* at 104.

The rule of *McMichael* is that UM/UIM coverage must extend "to a class of insureds coextensive with the class of insureds covered under the liability provision of the policy," unless UM/UIM coverage is altogether rejected in writing by the named insured. *Id.* at 98. Domokos's summary judgment response brief construes this language very broadly (*see* ECF No. 76 at 32), but Shelter's reply brief has prompted her to narrow the argument. Shelter says that "*McMichael* does not require a policy to provide UM/UIM coverage to anyone who might ever have liability coverage under a policy, but only where that individual would have had liability coverage for that accident." (ECF No. 85 at 14 (underscoring in original).) Domokos's reply in support of her cross-motion for summary judgment, which is effectively a surreply to Shelter's reply brief, concedes this interpretation. (ECF No. 88 at 9.) Domokos further concedes that, "although Glenn, Josephine, and Amy are all named in the same group as 'additional [listed] insureds,' only Glenn and Josephine in this group (and not Amy) would qualify

for UIM coverage if they were involved <u>in this accident</u> in the Altima." (*Id.* (underscoring in original).)  But Domokos then asserts that "[t]his is the exact type of class discrimination that *McMichael* prohibits." (*Id.*)

Domokos's argument skips a step in the *McMichael* analysis.  Domokos starts with the question, "Who is covered under the UM/UIM provision?"  Starting there is unhelpful because if Amy were covered under the UM/UIM provision, this dispute would never have arisen.  The proper first question is, "Who is covered under the liability provision?"  Once *that* question is answered, the court then looks to the UM/UIM provision and see if "class of insureds" is "coextensive."  *McMichael*, 906 P.2d at 98.

Moreover, as the parties realize, a court must inquire about the circumstances of the particular accident as it relates to the liability coverage.  The difference between liability and UIM coverage in *McMichael* was the difference between "using" and "occupying" a "covered 'auto'" with permission from the employer.  If the injured party had not been "using" the vehicle within the meaning of the liability coverage (or if his employer had revoked his permission to drive the vehicle, or if the vehicle was not a "covered 'auto'"), then there would have been no discrepancy (or at least none the injured party would have standing to complain about) between liability and UIM coverage.  In other words, a court cannot look solely at the classes of persons named in the liability policy, but must also look at whether those classes of persons would have received liability coverage under the circumstances of the accident in question.  *See id.* at 101 ("Because we have decided that the Aetna policy must provide UM/UIM coverage to permissive users of insured vehicles, resolution of this case depends on whether McMichael was *using* an insured vehicle at the time of the accident." (emphasis

in original)).

Here, Coverages A and B will pay for additional listed insureds' liability "resulting from their **maintenance**, **use**, or **operation**, of the **described auto** and **non-owned autos**." (ECF No. 51-7 at 14.) Accordingly, per *McMichael*, the question is whether this provision would cover the other parties to the Altima accident if the accident had been Domokos's fault. If the answer is yes, then Coverage E must provide equal coverage to Domokos. But in the answer is no. Coverages A and B extend to additional listed insureds when they are driving "the **described auto** and **non-owned autos**." (ECF No. 51-7 at 14.) Domokos was driving neither at the time of her accident, so Coverages A and B would not have applied if the accident had been her fault. Accordingly, the lack of benefits under Coverage E is immaterial under *McMichael*.

## C.     Waiver

As a further alternative argument, Domokos asserts that Coon's handling of the claim, including her conclusion that UIM benefits were available and her offer of $75,000, constitutes waiver of Shelter's right to deny UIM coverage. (ECF No. 76 at 33–35; *see also* Part II.C, above.) This argument fails for at least two reasons.

First, Colorado law is well-established that waiver cannot create coverage that does not exist under an insurance policy. *See Compass Ins. Co. v. City of Littleton*, 984 P.2d 606, 620 (Colo. 1999); *Empire Cas. Co. v. St. Paul Fire & Marine Ins. Co.*, 764 P.2d 1191, 1198 (Colo. 1988); *Hartford Live Stock Ins. Co. v. Phillips*, 372 P.2d 740, 742 (Colo. 1962). Federal courts applying Colorado law have applied this principle where the insurance company has paid some benefits already. *Gallegos v. Safeco Ins. Co. of Am.*, 646 F. App'x 689, 695 (10th Cir. 2016); *RK Mech., Inc. v. Travelers Prop.*

*Cas. Co. of Am.*, 944 F. Supp. 2d 1013, 1019–20 (D. Colo. 2011).[13]

Second, the Caravan policy states, "The provisions of this policy may be changed or waived only by written agreement signed by **us**. No **person** should consider any other action to indicate **our** waiver of any policy provision." (ECF No. 51-7 at 13.) Domokos argues that Coon's letters offering UIM benefits qualify as the necessary writings, and that the $75,000 check is "the *coup de grace* signed by Shelter," thus meeting the "signed by us" requirement. (ECF No. 76 at 33–34.) Domokos cites no authority for the notion that a series of letters (none of which relate to the question of whether the policy should be changed) followed by a signed check can amount to a "written agreement signed by [the insurance company]" to change or waive some part of the policy. In truth, Domokos is arguing that Shelter's adjuster's *course of conduct* constitutes waiver, but that is precisely the argument that the anti-waiver clause is intended to foreclose.

For these reasons, Domokos's waiver argument fails.

## D.    Failure to Properly Attain Rejection of UIM Coverage under the Altima Policy

Domokos's final alternative argument is that her written rejection of UM/UIM coverage on the Altima was "not sufficient to meet the standards set forth in *Parfrey*" (ECF No. 76 at 36), referring to *Allstate Insurance Co. v. Parfrey*, 830 P.2d 905 (Colo. 1992). The *Parfrey* case involved a section of the UM/UIM statute that requires insurers to offer to insureds the opportunity to increase their UM/UIM coverage from the statutory minimum up to "the insured's bodily injury liability limits." Colo. Rev. Stat. § 10-4-

---

[13] Even if payment of benefits had greater effect, it is not clear that Domokos has accepted Shelter's payment. (*See* Part II.C, above.)

609(2). The question presented was whether a private right of action against the insurance company exists under this statute when the insured was never told of this opportunity and is later involved in an accident where the minimum UM/UIM benefits are not enough. 830 P.2d at 908–10. The Colorado Supreme Court held that the statute

> creat[es] a one-time duty upon an insurer to notify an insured of the nature and purpose of UM/UIM coverage and to offer the insured the opportunity to purchase such coverage in accordance with the insurer's rating plan and rules and in an amount equal to the insured's bodily injury liability . . . .

*Id.* at 912. Moreover, this duty is enforceable through an implied private right of action. *Id.* at 910–11.

Shelter argues that *Parfrey* has never before been raised in this case—not even in the Final Pretrial Order (ECF No. 72)—so Domokos has forfeited any *Parfrey* cause of action. (ECF No. 85 at 16–17.) Domokos responds that "this is not a claim for fraud that requires pleading with particularity," her complaint generally alleges liability "in accordance with the provisions of C.R.S. § 10-4-609," and the Final Pretrial Order "does not exclude a claim for UIM benefits under the Altima Policy." (ECF No. 88 at 13.) In other words, Domokos all but admits that she is now attempting to raise a new cause of action.

This Court may modify the Final Pretrial Order "only to prevent manifest injustice." Fed. R. Civ. P. 16(e). Domokos has not moved for such relief.[14] But the Court need not decide whether such relief might be available because *Parfrey* is plainly

---

[14] In her reply in support of her cross-motion for summary judgment, she makes a Rule 15 amendment-to-conform-to-the-evidence argument. (ECF No. 88 at 13.) But this case is now governed by Rule 16, not 15. Moreover, "[a] motion shall not be included in a response or reply to the original motion. The motion shall be filed as a separate document." D.C.COLO.LCivR 7.2(d); *see also* WJM Revised Practice Standard III.B ("All requests for the Court to take any action, make any type of ruling, or provide any type of relief must be contained in a **separate**, written motion." (emphasis in original)).

inapplicable here.  This is not a case about whether Shelter satisfied its "one-time duty" to offer UM/UIM coverage above the statutory minimums.  *Parfrey*, 830 P.2d at 912.

In her reply in support of her cross-motion for summary judgment, Domokos argues that "[t]he rejection of UM/UIM coverage completely and the rejection of UM/UIM coverage at the same amount as liability (instead opting for lower UM/UIM limits) is unimportant to the holding in *Parfrey* and the statutory mandate of requiring UM/UIM coverage unless rejected in writing."  (ECF No. 88 at 12.)  To the contrary, everything about *Parfrey* is focused on the meaning of, and whether a private right of action should be implied under, § 10-4-609(2), which governs the insurer's duty to offer higher UM/UIM limits.  It has nothing to do with rejection of coverage, which is addressed in § 10-4-609(1)(a).

Domokos continues that "the insurer's obligation[] to properly and reasonably inform a consumer about UM/UIM coverage is even more important in the context of an insurer who decides to reject UM/UIM coverage completely than an insurer who opts for a low limit policy."  (ECF No. 88 at 12.)  In other words, in the latest brief addressing an already-late argument, Domokos appears to be asking the Court to predict that the Colorado Supreme Court would extend *Parfrey* to the circumstances of this case.  *That* argument is inexcusably untimely and is deemed forfeited.

For these reasons, Domokos's *Parfrey* argument fails.

### E.    Relationship to Bad Faith and Unreasonable Delay/Denial Claims

The foregoing demonstrates that UIM coverage does not exist for Domokos under the Caravan policy and that her theories for imputing such coverage to additional listed insureds fail.  Thus, Shelter is entitled to summary judgment on Domokos's first and second causes of action.  The final question is the effect of this outcome on

Domokos's third and fourth causes of action, for unreasonable delay/denial of insurance benefits and common-law bad faith breach of insurance contract, respectively. The Court will address both in turn.

1.    Unreasonable Delay/Denial

Domokos's claim for unreasonable delay or denial of insurance benefits is defined by statute as follows: "A first-party [insurance] claimant . . . whose claim for payment of benefits has been unreasonably delayed or denied may bring an action in a district court to recover reasonable attorney fees and court costs and two times the covered benefit." Colo. Rev. Stat. § 10-3-1116(1). Given the phrase "covered benefit," the cause of action hangs on a finding of coverage—or in other words, it cannot be unreasonable to delay or deny coverage that does not exist. Because neither the Caravan nor Altima policies provide UIM coverage for Domokos's car accident, Shelter is entitled to summary judgment on Domokos's unreasonable delay/denial cause of action.

2.    Common-Law Bad Faith

In the context of first-party insurance claims, the Colorado Supreme Court first recognized the tort of bad faith breach of insurance contract in *Travelers Insurance Co. v. Savio*, 706 P.2d 1258 (Colo. 1985) ("*Savio*"). The court defined the claim as follows: "a . . . claimant who asserts that an insurer has failed to pay a claim in bad faith must establish that the insurer acted unreasonably and with knowledge of or reckless disregard for the fact that no reasonable basis existed for denying the claim." *Id.* at 1274. This language links bad faith to the existence of coverage just as much as the unreasonable delay/denial statute.

However, the *Savio* opinion also shows that *failing to pay a claim* in bad faith is

not the only form of bad faith that a plaintiff might assert against his or her insurer. *Savio* says, for example,

> The right to compensation depends on the resolution of specific factual and legal issues between carriers and claimants. Whether in a particular case disputes involving those issues are entertained in good faith presents a related, but quite different, question, the resolution of which does not depend on the validity of the underlying compensation claim.

*Id.* at 1270. Apparently with this in mind, the opinion later states, "As the previous discussion indicates, bad faith is not limited to the decision to grant or deny a claim; rather, bad faith can occur in the unreasonable refusal to investigate a claim and to gather facts." *Id.* at 1274 n.20.

Following *Savio*, the Colorado Court of Appeals has held that bad faith claims may go forward even if a suit under the policy itself is time-barred. *See Flickinger v. Ninth Dist. Prod. Credit Ass'n*, 824 P.2d 19, 24–25 (Colo. App. 1991). In this light, and in light of *Savio*'s endorsement of bad faith claims based on the insurance company's manner of dealing with the insured (as distinct from bad faith claims founded on refusal to pay), it is clear under Colorado law that that a manner-of-dealing claim may go forward even if coverage does not exist, so long as there is evidence to support both liability and damages.[15]

Here, Domokos's common-law bad faith claim is grounded in Shelter's handling of Domokos's assertion that the accident caused her to develop a stutter. (*See* ECF

---

[15] In a manner-of-dealing bad faith claim, where it is established that the insurance company did not have a duty of coverage, damages must necessarily be independent of the consequences of the insurance company's failure to pay the benefit, *e.g.*, "emotional distress, pain and suffering, inconvenience, fear and anxiety, and impairment of the quality of life." 8A John W. Grund *et al.*, *Colo. Practice Series: Personal Injury Torts and Insurance* § 56:19 (3d ed., Sept. 2018 update) (footnotes omitted).

No. 76 at 38.)  Shelter does not argue that Domokos lacks evidence from which a reasonable jury could find liability or damages under this theory.  Shelter argues only that if coverage does not exist, bad faith cannot exist.  (*See* ECF No. 51 at 10; ECF No. 85 at 19–20; ECF No. 95 at 3–5.)  That argument is incorrect as to bad faith tort claims that attack the insurer's manner of dealing with the insured.  Accordingly, Shelter is not entitled to summary judgment on Domokos's common-law bad faith claim.

## IV.  PRACTICAL CONSEQUENCES

Unless there is significantly more to this case than the summary judgment briefing reveals, the Court's rulings above narrow this dispute solely to Domokos's common-law bad faith claim based on the emotional distress allegedly caused by Shelter's position that her stutter was not a result of a car accident.[16]  In this light, the Court strongly encourages the parties to consider the appropriateness of settlement negotiations, including the possibility of a settlement conference in front of the magistrate judge.  Any motion to set such a settlement conference would be promptly granted.

## V.  CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1.  Defendant's Motion for Summary Judgment (ECF No. 51) is GRANTED as to Plaintiff's claim 1 (UIM benefits), claim 2 (breach of contract), and claim 3 (unreasonable delay/denial), but DENIED as to Plaintiff's claim 4 (common-law bad faith);

---

[16] The Court recognizes that the parties' dueling Rule 702 motions to exclude each other's bad-faith expert remain pending.  (*See* ECF Nos. 89–90.)  The Court will reach those motions in due course.

2.     Plaintiff's Cross Motion for Summary Judgment (ECF No. 79) is DENIED; and

3.     This matter REMAINS SET for a Final Trial Preparation Conference on October 11, 2019, at 2:00 PM, and a five-day jury trial to begin on October 28, 2019, at 8:30 AM, both in Courtroom A801.

Dated this 24th day of September, 2019.

BY THE COURT:

William J. Martinez
United States District Judge