# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO
**Judge William J. Martínez**

Civil Action No. 18-cv-0903-WJM-NRN

AMY DOMOKOS,

     Plaintiff,

v.

SHELTER MUTUAL INSURANCE COMPANY,

     Defendant.

---

## ORDER ON RULE 702 MOTIONS

---

Plaintiff Amy Domokos ("Domokos") brought this suit against Shelter Mutual Insurance Company ("Shelter") for breach of insurance contract, common-law bad faith breach of insurance contract, and unreasonable delay or denial of insurance benefits in violation of Colorado Revised Statutes §§ 10-3-1115 and -1116. Through summary judgment, Domokos's claims have been reduced to one: a bad faith claim based on Shelter's investigation of her claim and manner of dealing with her in that process. *See Domokos v. Shelter Mut. Ins. Co.*, ___ F. Supp. 3d ___, 2019 WL 4645430 (D. Colo. Sept. 24, 2019) (ECF No. 109). A trial is scheduled to begin on April 6, 2020.

Currently before the Court are two motions: (1) Shelter's Motion to Exclude Testimony of Plaintiff's Expert Garth Allen Pursuant to F.R.E. 702 (ECF No. 89); and (2) Domokos's Motion to Exclude Testimony by Defendant's Expert Jon F. Sands at Trial (ECF No. 90). For the reasons explained below, each of these motions is granted in part and denied in part.

# I. LEGAL STANDARD

A district court must act as a "gatekeeper" in admitting or excluding expert testimony. *Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1232 (10th Cir. 2004). Admission of expert testimony is governed by Federal Rule of Evidence 702, which provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

The proponent of the expert testimony bears the burden of proving the foundational requirements of Rule 702 by a preponderance of the evidence. *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009) (en banc).

An expert's proposed testimony also must be shown to be relevant and otherwise admissible. *See Adamscheck v. Am. Family Mut. Ins. Co.*, 818 F.3d 576, 588 n.7 (10th Cir. 2016). To be relevant, expert testimony must "logically advance[] a material aspect of the case" and be "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *United States v. Garcia*, 635 F.3d 472, 476 (10th Cir. 2011).

The trial court's focus under Rule 702 is on the methodology employed by an expert, not on his or her conclusions. *Bitler*, 400 F.3d at 1233. Ultimately, "the rejection of expert testimony is the exception rather than the rule." Fed. R. Evid. 702 advisory committee's note. "[T]he trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system. . . . Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and

appropriate means of attacking shaky but admissible evidence." *Id.* (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 595 (1993)).

## II. BACKGROUND

As detailed in the Court's summary judgment order, *see Domokos*, 2019 WL 4645430, at *1–5, Domokos was involved in a car accident that allegedly left her with lingering injuries, including a severe stutter that has affected her career as a schoolteacher. She made an underinsured motorist ("UIM") claim on Shelter, which handled the claim under what would turn out to be a misimpression that the relevant insurance policy provided UIM benefits to Domokos. When Domokos and Shelter reached an impasse (particularly about the extent of her injuries, including the stutter), Domokos filed this lawsuit. Shelter then asserted that Domokos's father—who paid for the insurance policies on various cars driven by family members, including his daughter's—had removed UIM coverage for persons who were not residing in his household.

Domokos was not residing in her father's household at the time of the accident and so, by the time of summary judgment, she no longer "argue[d] that the [relevant] policy (or any other policy), by its terms, provides UIM coverage to her. She argue[d] only under the facts of this case that Colorado law requires UIM coverage to be deemed to exist." *Id.* at *5. This Court ruled as a matter of law that no principle of Colorado law asserted by Domokos (*e.g.*, reasonable expectations, waiver, estoppel) required UIM coverage to be imputed to the policy. *Id.* at *5–16. And, in the absence of such coverage, Domokos could not bring claims for unreasonable delay/denial, nor for common-law bad faith to the extent based on denial of insurance benefits owed. *Id.* at

*17. Domokos could, however, continue to pursue Shelter under a common-law bad faith claim based on Shelter's manner of dealing with her during the claims investigation process, such as its skepticism about the connection between the accident and her stutter. *Id.* at *18.

After summary judgment briefing concluded but before the Court issued its decision, the parties filed their respective Rule 702 motions. Each motion attacks the other side's bad faith expert. Domokos's bad faith expert is Garth H. Allen, a Colorado attorney who was Executive Director of the Colorado Insurance Education Foundation from 1973 to 2016. (*See* ECF No. 89-1 at 1.)[1] Shelter's bad faith expert is Jon F. Sands, a Colorado attorney who has spent most of his approximately forty-year career handling insurance disputes, teaching about insurance, and advising insurance companies. (*See* ECF No. 90-1 at 3–4.)

Neither side argues that the other's expert is entirely unqualified or that his opinions are entirely inadmissible. Rather, each side contests specific opinions as inadmissible for various reasons.

### III. PRELIMINARY OBSERVATIONS

A common-law bad faith claim has four elements:

> 1. The plaintiff had (injuries) (damages) (losses);
>
> 2. The defendant acted unreasonably in (insert appropriate description, e.g., "denying payment of the plaintiff's claim");
>
> 3. The defendant knew that its (conduct) (position) was unreasonable or the defendant recklessly disregarded the fact that (his) (her) (its) (conduct) (position) was

---

[1] All ECF page citations are to the page number in the CM/ECF header, which does not always match the document's internal pagination, particularly in exhibits with unnumbered cover pages.

> unreasonable; and

> 4. The defendant's unreasonable (conduct) (position) was a cause of the plaintiff's (injuries) (damages) (losses).

Colo. Jury Instr., Civil 25:2 (4th ed., June 2019 update). "The reasonableness of an insurer's conduct is measured objectively based on industry standards . . . ." *Am. Family Mut. Ins. Co. v. Allen*, 102 P.3d 333, 343 (Colo. 2004) ("*Allen*").

The Colorado Supreme Court has never given clear content to what it means by "industry standards." For example, Colorado has adopted the uniform Unfair Claims Settlement Practices Act ("UCSPA"), Colo. Rev. Stat. § 10-3-1104(1)(h)(IV), but the Colorado Supreme Court says that the UCSPA is "valid, but not conclusive, evidence of industry standards," *Allen*, 102 P.3d at 344. And while insurance industry standards may seem to be a body of technical knowledge on which most jurors have never been educated, expert testimony is not necessarily required depending on the type of claim presented to the insurance company. *Id.* at 344–45.

Nonetheless, both sides present experts in this case. Both experts at times invoke their knowledge of the law (Mr. Allen relies on the UCSPA, Mr. Sands relies on case law). Invoking the law can, at times, raise the possibility that the expert is "encroach[ing] upon the trial court's authority to instruct the jury on the applicable law." *Specht v. Jensen*, 853 F.2d 805, 807 (10th Cir. 1988). However, specifically in the insurance bad faith context, this is usually less of a worry because "the applicable law," as defined by the Colorado courts, is usually stated at a very high level (such as "reasonableness" in the *Allen* decision), thus treating most everything else (such as industry standards) as a factual question, even if the "facts" informing those standards include statutes and case law.

The Court keeps these principles in mind as it resolves the parties' disputes described below.

## IV.  ANALYSIS: SHELTER'S MOTION

Shelter has itemized twenty-three opinions (which it labels "a" through "w") that are allegedly inadmissible, and Shelter further objects to an entire section of Mr. Allen's report as inadmissible (without objecting to specific opinions).  The Court will proceed through all of Shelter's objections in turn, preserving Shelter's letter designations.

**A.  Opinions Challenged as Unreliable or Unsupported**

> *a. "An insurer is required to fully inquire into possible bases that support the insured's claim."  (ECF No. 89-1 at 6.)*

As to this assertion, Shelter states: "Colorado law references only an obligation to conduct a <u>reasonable</u> investigation based on all available information, *see* C.R.S. § 10-3-1104(1)(h)(IV), not to 'fully inquire into possible bases that support the insured's claim.'"  (ECF No. 89 at 4 (underscoring in original).)  The citation is to the UCSPA, which states that "[r]efusing to pay claims without conducting a reasonable investigation based upon all available information" is an unfair claims settlement practice.

As already noted, the UCSPA is not the be-all-and-end-all of insurance industry standards.  *Allen*, 102 P.3d at 344.  Moreover, the UCSPA does not define "reasonable."  The question, then, is whether Mr. Allen's opinion in any way contradicts an established industry standard, such as this portion of the UCSPA.

Shelter's only argument in this regard is that "it is the insured who has the obligation to affirmatively establish the facts supporting her UIM claim and alleged damages, not the insurer.  *See Briggs v. Am. Family Mut. Ins. Co.*, 833 P.2d 859, 861 (Colo. App. 1992)."  (ECF No. 89 at 4.)  This is a misrepresentation of *Briggs*, which

states only that an insured seeking UM benefits "has the burden to prove that the uninsured motorist was negligent and the extent of the damages." 833 P.2d at 861. That circumstance has no bearing on this case.

The Court therefore overrules Shelter's objections to opinion "a."

> *b. "An insurer's most fundamental duty is the duty to investigate claims because without a reasonable, proper and timely investigation the insurance policy benefits cannot be paid in a reasonable and timely manner." (ECF No. 89-1 at 6.)*

Shelter does not explain its specific objection to this statement. Whatever objection Shelter intended to raise is therefore forfeited.

> *c. "Taking an unreasonable position or engaging in unreasonable conduct, including actions prohibited by the UCSPA, is bad faith." (ECF No. 89-1 at 6.)*

Shelter points out, accurately, that "unreasonable conduct is not by itself sufficient to demonstrate 'bad faith,'" because there must also be knowledge or recklessness. (ECF No. 89 at 4; *see also* Part III, above.) Mr. Allen's opinion also attempts to, in essence, dictate a jury instruction, which impermissibly invades the province of the Court. Shelter's objection to this opinion is therefore sustained.

> *d. "The rules contained in the [UCSPA] are considered minimum insurance industry standards . . . ." (ECF No. 89-1 at 7.)*

Shelter argues that this opinion is improper in light of *Allen*'s statement that the UCSPA "may be used as valid, but not conclusive, evidence of industry standards." 102 P.3d at 344. This statement is not necessarily inconsistent with Mr. Allen's opinion about what the insurance industry considers to be "minimum" standards. Accordingly, this objection is overruled.

> *e. "[T]he standard in the insurance industry in Colorado is to consider three categories of damages [i.e. economic damages, noneconomic damages, and physical impairment damages]. . . . If a category of damages is not included in a valuation of the amount the insured was legally entitled to recover, a*

*reasonable explanation for exclusion for the damages category must exist."* (ECF No. 89-1 at 8.)

*f. "The standard in the insurance industry is to consider each applicable area of damages, gather available information in order to estimate the damages, and then assign a high and low range of damages for each category." (Id.)*

*g. "[I]nsurers act unreasonably if they . . . fail to include medical expenses when the medical expenses are reasonable and accident related or if one of the categories, such as impairment, applies to the loss but is omitted from the estimate." (Id. at 8–9.)*

*h. "A range of values for pain and suffering from one to three times the medical expenses . . . would be within a reasonable range." (Id. at 10.)*

*i. "[An insurer] must use a medical professional with credentials at least equal to the treating professionals in order to evaluate the medical condition. The standard in the insurance industry is to use an . . . [IME] to learn more about injuries, conditions, and the future impact of the medical condition." (Id.)*

*j. By not "attach[ing] any numbers, values, or a range of values to the various components of damages . . . Shelter is violating anther industry standard, the standard that requires insurance companies to promptly provide a reasonable explanation of the bases in the insurance policy in relation to the facts or applicable law for the denial of a claim or for the offer of a compromise settlement." (Id. at 12–13.)*

*k. "Shelter's duty, even it if did not ordinarily consider categories of damages when evaluating UIM claims, was to consider those categories when requested to do so by insured's counsel." (Id. at 13.)*

Shelter attacks all of these statements as "not reliable" because Mr. Allen's report

> fails to identify what (if any) specific materials or data
> support these opinions. He references no applicable
> industry materials on which he bases this opinion. He also
> does not attempt to ground his opinions in experience, as he
> provides no discussion of any previous experience, any
> procedures or standards he has previously seen applied, or
> how any experience informs his analysis here.

(ECF No. 89 at 5.)

The Court sees no basis for exclusion. Mr. Allen makes clear at the beginning of

his report, and again in his discussion of insurance industry standards generally, that he

reaches his conclusion through 43 years of experience in the insurance industry,

> regularly review[ing] the claim files in approximately twenty
> cases per year as an insurance consultant and expert
> witness.  The review typically include[s] a review of the claim
> manuals of various insurance companies thus allowing me to
> compare, synthesize, and identify insurance industry
> standards, customs, practices, and procedures regarding
> automobile insurance claims. . . .
>
> * * *
>
> . . . I have reviewed hundreds of claims involving many
> different insurance companies.  I have had many
> opportunities to discuss problems, claim procedures, and
> claim decisions with insurance adjusters, insurance
> regulators, and attorneys for both claimants and insurance
> company defendants.  Those opportunities and experiences
> result in an ability to identify common courses of conduct,
> and thus identify insurance industry practices and standards
> in daily claim adjusting.

(ECF No. 89-1 at 1, 5.)  Mr. Allen was not required to repeat all of this again

immediately before giving his opinions "e" through "k."  The Court therefore overrules

Shelter's objections to these opinions.

## B.    Opinions Challenged as Unreliable or Unhelpful to the Jury

> *l. "As a result of the collision, Domokos suffered physical, psychological, and
> neurological injuries, including a traumatic brain injury (TBI), and underwent
> medical treatment.  Domokos suffered from neck and back sprains, a muscle
> spasm, and a concussion."  (ECF No. 89-1 at 2.)*
>
> *m. "Domokos developed a severe and debilitating stutter, which substantially
> impaired her ability to speak."  (Id.)*
>
> *n. "Domokos sustained compensable losses including past and future medical
> expenses, past and future lost wages, non-economic pain and suffering
> losses, and physical impairment.  Domokos suffered in the past, and,
> according to medical providers and professionals, will most likely continue to
> suffer in the future, non-economic damages including . . . pain and suffering,
> loss of enjoyment of life, inconvenience, emotional stress and impairment of
> quality of life.  Domokos also suffers from physical impairment . . . which will
> continue into the future . . . ."  (Id.)*

Shelter argues that Mr. Allen is "not qualified" to render these opinions,

presumably because he is not a medical expert. (ECF No. 89 at 7.) Domokos responds that the challenged excerpts are based on "documents reviewed" and are "factual context for the opinions [Mr. Allen] reaches in subsequent sections." (ECF No. 92 at 7.) Domokos further insists that Mr. Allen is "not creating a new diagnosis or disagreeing with the records related to Ms. Domokos' injuries." (*Id.*)

Domokos appears to concede Shelter's argument (otherwise well-taken) that Mr. Allen cannot give a medical opinion. However, calling this "factual context" based on "documents reviewed" does not fully address the problem. In these circumstances, the question is what a reasonable insurance company should have understood about Domokos's medical condition in light of the documents in question (assuming they are the same documents that were available to Shelter). Mr. Allen does not offer an opinion about why a reasonable insurance company should have come to the same conclusions he did when reviewing these documents.

Mr. Allen is free to state that Shelter's recognition of the connection (or arguable connection worth investigating) between the accident and the various consequences is an *assumption* underlying his opinions, but he may not testify that his assumption is founded on medical records or other similar records from which he is not qualified to form a medical opinion. Nonetheless, the Court does not currently have enough context to say that there is no legitimate reason for Mr. Allen to summarize medical records or diagnoses as part of his testimony. Accordingly, Shelter's objection is sustained in part and overruled without prejudice in part.

> o. *"If Shelter had considered and valued the stutter-related future pain and suffering and impairment, it would have concluded that omitted damages were, most likely, substantially greater than the [remaining policy limits]."* (ECF No. 89-1 at 10.)

> *p. Assuming Shelter related the stutter to the accident, "the $75,000 [it paid] is far below any reasonable range of values for [her] injuries." (Id. at 11.)*

> *q. "[U]nder Colorado law, Ms. Domokos would qualify as a thin skull plaintiff . . . ," (id.) and "[i]t was a misrepresentation of law and unreasonable practice" for Shelter to "reduce the value of [her] claim . . . because prior mental and physical health contributed to her stuttering problem'" (id. at 13).*

> *r. "The speech impairment, for a young claimant such as Domokos, must be valued in hundreds of thousands, not tens of thousands." (Id. at 11–12.)*

> *s. "Valuing the speech impairment at anything less than $200,000 . . . can only accurately be described as a low-ball offer far below the minimum, lower end, of any reasonable range of values." (Id. at 12.)*

Shelter makes no specific argument as to these opinions, except (perhaps) in a passing reference to opinions that are "not appropriate expert testimony or helpful to the jury." (ECF No. 89 at 7.) To the extent this is a properly preserved objection, the Court overrules it—these opinions are fairly standard for an insurance bad faith expert.

If Shelter objects to opinion "q" as an improper legal opinion, the Court again overrules the objection. In the full context of the opinion, Mr. Allen is describing a concept known to insurance adjusters, including the adjuster that handled Domokos's claim. (*See* ECF No. 89-1 at 11 ("under Colorado law Ms. Domokos would qualify as a thin skull plaintiff, something acknowledged by Ms. Coon").) Thus, invoking the "thin skull" doctrine in this context is appropriate for explaining why he believes Shelter acted unreasonably and knew it was acting unreasonably.

## C. Opinions Challenged as Conclusory

> *t. "[Shelter's] investigation . . . , and in particular into [Domokos'] stutter, was . . . unreasonable." (ECF No. 89-1 at 13.)*

> *u. "Shelter's conduct . . . meets the test for insurer bad faith conduct in Colorado under both common law and statute." (ECF No. 89-1 at 15.)*

Shelter argues that these are improper opinions about the ultimate issue. (ECF

No. 89 at 8–9.) "An opinion is not objectionable just because it embraces an ultimate issue." Fed. R. Evid. 704. Shelter offers no reason why these particular ultimate-issue opinions are unusually objectionable. The jury will know why Mr. Allen is there, and Mr. Allen will be testifying as to all of Shelter's individual acts or omissions that were, in his opinion, unreasonable, so it adds barely anything—and certainly nothing unduly prejudicial—to allow him to state an ultimate conclusion. Shelter's objection is therefore overruled.

However, the Court *sua sponte* excludes the portion of opinion "u" referring to statutory unreasonable delay/denial because that claim fails as a matter of law, as explained at summary judgment. *See Domokos*, 2019 WL 4645430, at *17.

> v. *"Shelter knew or should have known its conduct was unreasonable. Shelter's conduct and decisions were never the result of simple oversight or error. To the contrary, all decisions were intentional and purposeful. Shelter had to know that it was withholding payment of benefits due to no legitimate reason for failing to make and explain a reasonable offer of settlement."* (ECF No. 89-1 at 16.)

The Court agrees with Shelter that this opinion is problematic because it is not clear how Mr. Allen is qualified to peer into the subjective state of mind of Shelter's agents and employees.[2] Domokos's counsel can appropriately ask Mr. Allen questions such as "Based on your experience in reviewing claim files and discussing claims with insurers, do Shelter's decisions appear intentional?" or "Have you ever worked with an insurance company that made a decision like this merely out of oversight?" However, Shelter's objection is sustained to the extent Mr. Allen intends to offer a firm opinion about Shelter's state of mind.

---

[2] The last sentence of the challenged opinion, beginning with "Shelter had to know . . .", is grammatically garbled, making its meaning unclear. The Court takes it to be in the same vein as the sentences that preceded it: a statement about Shelter's state of mind.

*w. "[T]he failure to timely pay or explain the low offers was done recklessly and without regard to Shelter's very fundamental obligation to make reasonable payments in a prompt, timely manner, or, at a minimum, explain why it was willing to offer so little for a very significant injury." (ECF No. 89-1 at 16.)*

The Court agrees with Shelter that this opinion is, at best, an instruction to the jury about the law, and therefore impermissible. The full context of the opinion is important:

> Even if I assume [that] the persons [whom] Shelter hired to adjust this claim did not know this failure to timely pay benefits was unreasonable, the failure to timely pay or explain the low offers was done recklessly and without regard to Shelter's very fundamental obligation to make reasonable payments in a prompt, timely manner, or, at a minimum, explain why it was willing to offer so little for a very significant injury.

(ECF No. 89-1 at 16.) In other words, Mr. Allen is presenting an alternative to his intentionality opinions, because the *mens rea* can be satisfied if the insurance company acted knowingly *or* recklessly. And, he says, the reckless form of liability exists if the relevant insurance company employees or agents were not subjectively aware that they were violating industry standards.

If this is a correct statement of the law of recklessness in the insurance bad faith context—neither Mr. Allen nor Domokos cites any supporting authority, nor is the Court aware of any—then the appropriate method of proof is through normal (*i.e.*, non-expert) testimony establishing the employees' or agents' lack of awareness, and then a properly supported jury instruction stating that violating industry standards without knowing it equates to recklessness for purposes of insurance bad faith. Domokos is free to pursue that path, assuming the legal authority exists to support it, but Mr. Allen may not simply declare it to be the law. Shelter's objection is therefore sustained.

**D.      Opinions About "Post-Suit Issues"**

As described above, Shelter adjusted this claim under a mistaken belief that UIM coverage extended to Domokos.  Only after suit was filed did Shelter realize its mistake.

Mr. Allen's expert report contains a section titled "Post-suit issues" in which he notes his understanding that "Shelter may attempt to avoid payment of this claim in its entirety by asserting that . . . [Domokos] did not qualify for UIM coverage under her father's vehicle because she was no longer a resident relative."  (ECF No. 89-1 at 16.)  Mr. Allen says that "if Shelter reverses course at the proverbial eleventh hour, . . . I reserve the right to supplement my report."  (*Id.*)  But rather than leaving it there, he goes on for approximately three additional pages, stating what his supplemental opinions would be.  (*Id.* at 16–19.)

Mr. Allen's supplemental opinions fall into two broad categories.  The first and largest category is a set of essentially legal arguments explaining why, in his view, the doctrines of waiver, estoppel, and reasonable expectations should prevent Shelter from denying coverage at this stage.  (*Id.* at 16–18.)  Shelter argues that these opinions usurp the Court's role of applying the law to the terms of the insurance policy.  (ECF No. 89 at 9–10.)  The Court agrees, especially since the Court rejected these theories at summary judgment.  Accordingly, Shelter's objection is sustained as to these opinions.

Mr. Allen's second category of supplemental opinions asserts that denying coverage "at this late date . . . is another example of bad faith conduct," in violation of insurance industry standards such as the duty to "thoroughly research all coverage issues before conveying a coverage decision to a policyholder" and to "affirm or deny coverage of claims within a reasonable time period after proof of loss statements have been completed."  (ECF No. 89-1 at 18, 19.)  Shelter argues that these opinions should

be excluded because

> courts have repeatedly held that evidence of defenses and
> other claims raised by an insurer in litigation is properly
> excluded, as it lacks probative value, carries a high risk of
> prejudice, and is contrary to the principle that insurers do not
> act in bad faith by litigating legitimate disputes with insureds.

(ECF No. 89 at 10.)

Shelter relies on *Parsons ex rel. Parsons v. Allstate Insurance Co.*, 165 P.3d 809

(Colo. App. 2006), and similar cases. These cases say that a plaintiff hoping to base a

bad faith claim on "attorney litigation conduct" must present "extraordinary facts" to

overcome the policy in favor of allowing the opportunity for "a vigorous defense" to all

defendants. *Id.* at 818–19. "Attorney litigation conduct" refers specifically to the kinds

of decisions an attorney (as opposed to the client) would make. *See id.* at 818

(insurer's counsel was accused of, *e.g.*, "groundless denials and defenses; refus[ing] to

allow discovery to proceed until a case management order was entered; [and]

declin[ing] to sign a case management order"). This is not quite what is at stake here,

because a coverage decision is for Shelter to make, not its litigation counsel. Rather, it

appears that the appropriate standard—regarding the conduct of the insurer, as distinct

from its litigation counsel—was expressed in *Dale v. Guarantee National Insurance

Co.*, 948 P.2d 545 (Colo. 1997), which states that "evidence of bad faith conduct which

occurred after the filing of the complaint [is] admissible [if the] evidence [shows] a

continuation of the same difficulties that preceded the filing of the complaint and [is]

relevant as evidence of a pattern of defendant's bad faith dealings with the plaintiff." *Id.*

at 552 (internal quotation marks omitted).[3]

---

[3] The Court recognizes that the line between attorney conduct and insurer conduct is not always clear. Here, however, the action complained of—denying coverage altogether—is

Domokos responds to Shelter's argument by asserting that this case fits within something like the *Dale* standard (although Domokos does not cite *Dale*, or any other authority): "Shelter's reversal of coverage relates back to Shelter's initial investigation and coverage determination, which occurred prior to litigation, at the time the claim was being handled. These two actions cannot be separated." (ECF No. 92 at 10.) However, the post-case filing decision to deny coverage altogether was not "a continuation of the same difficulties that preceded the filing of the complaint." *Dale*, 948 P.2d at 552. Indeed, "no coverage" is very different from "coverage is available, but we don't believe you're as injured as you claim." Thus, Mr. Allen's opinions on this topic are irrelevant. Shelter's objection is sustained on this basis, and the Court need not explore whether these opinions are also excludable for policy reasons, even if relevant.[4]

## V. ANALYSIS: DOMOKOS'S MOTION

Domokos itemizes thirteen of Mr. Sands's opinions that are allegedly inadmissible, and Domokos further objects to a certain category of (non-itemized) opinions. The Court will proceed through all of Domokos's objections in turn, preserving her numerical designations (which start over at 1 with each section of her argument).

### A. Opinions Challenged for Lack of Qualifications

*1. "[I]t is highly unusual to see someone claim a life altering head injury while being asymptomatic after the event." (ECF No. 90-1 at 13.)*

straightforwardly an insurer's decision to make (even if, say, its litigation counsel first developed the argument to support it).

[4] In any event, it is far from clear that Domokos is prepared to present a proper damages case based on post-suit conduct. "[A]n insured suing under the tort of bad faith breach of an insurance contract is entitled to recover damages based upon traditional tort principles of compensation for injuries *actually* suffered, including emotional distress." *Ballow v. PHICO Ins. Co.*, 878 P.2d 672, 677 (Colo. 1994) (emphasis in original). Thus, Domokos would need evidence of emotional distress, aggravation of the stutter, or other relevant damages *caused by* the reversal-in-coverage decision.

*2. "The records are inconsistent with any loss of consciousness, a factor important to an insurer in conducting an investigation into a claim of a traumatic brain injury. \* \* \* When one loses consciousness at the scene of the accident, it is intuitive that someone would notice and call for medical attention. No such fact is disclosed by the medical records. In fact, she explained a delay in getting initial treatment by stating that she was 'asymptomatic.'" (Id. at 13–14.)*

*3. "I find nothing in the records in which there is a recommendation for specific TBI treatment. In fact, the majority of the records support a somatoform disorder is at work." (Id. at 14.)*

*4. Categorizing Ms. Domokos' prior psychological history, suicide attempts, and hospitalization as "highly relevant matters." (Id. at 15.)*

*5. "It appears that the records do support a somatic or psychological condition involving fixation on health issues, anxiety, depression, prior accidents and psychological trauma and other factors for which treatment was available." (Id. at 16–17.)*

*6. With regards to a subsequent accident on January 4, 2016, asserting that "[t]his reporting is not consistent with either prior reporting and treatment or later reporting and treatment." (Id. at 15.)*

*7. "Medical providers are highly dependent upon accurate histories given by their patients. Ms. Domokos' reporting appears, at times, to have been inconsistent." (Id. at 16.)*

Domokos argues that Mr. Sands is not qualified to render these medical opinions. (ECF No. 90 at 4–6.) Shelter responds that Mr. Sands is simply "review[ing] and comment[ing] on the information that was available to Shelter in evaluating the claim, including the demand from her attorney and the relevant medical records, as is necessary to assess Shelter's claim handling." (ECF No. 93 at 2.) In support, Shelter cites *Peiffer v. State Farm Mutual Automobile Insurance Co.*, 940 P.2d 967 (Colo. App. 1996), which states, in the context of a bad faith claim, that "[a]n insurer's decision to deny benefits to its insured must be evaluated based on the information before the insurer at the time of that decision." *Id.* at 970. Moreover, says Shelter, Mr. Sands is "qualified to testify, from the perspective of an insurance claim handling, what

information from medical records would be relevant to the evaluation of [Domokos's] claim." ECF No. 93 at 2.)

The major problem with Shelter's explanation is that Mr. Sands nowhere links his opinions to anything a Shelter employee or agent did or said. Opinion 1, for example, might be admissible if framed as follows: "Shelter's adjuster believed that it is highly unusual to see someone claim a life altering head injury while being asymptomatic after the event, and that belief was a reasonable belief for an adjuster to form because it is an insurance industry standard that . . . ." However, Mr. Sands frames none of these opinions like this. Rather, as Domokos puts it, they appear to be his "attempts to re-evaluate the claim and find his own bases for denying benefits." (ECF No. 98 at 1.)

Shelter has cited no authority—and the Court is aware of none—that common-law bad faith may be excused if there is *any* objectively reasonable basis discernible in the record justifying the insurance company's conduct. Indeed, such a defense appears inconsistent with the cause of action. If the plaintiff can prove that the insurance company's actual conduct or position was unreasonable and that the insurance company knew of or recklessly disregarded that unreasonableness, then the insurance company has breached its duty to "deal fairly and in good faith," *Travelers Ins. Co. v. Savio*, 706 P.2d 1258, 1273 (Colo. 1985)—whether or not a more astute insurance company would have recognized a legitimate, reasonable basis for taking the same actions.

Accordingly, the Court sustains Domokos's objection to these opinions.

## B.     Opinions Challenged as "Demonstrably Untrue"

> *1. "The claim of a traumatic brain injury was not supported by the medical records, yet, Mr. Zaner represented that Ms. Domokos suffered from a traumatic brain injury." (ECF No. 90-1 at 12.)*

*2. "In the end, this claim involves an allegation of a traumatic brain injury that is not supported by the medical records; in fact it is dismissed by the records." (Id. at 16.)*

*3. "In loss of consciousness cases (in fact in almost all emergent claims of head trauma) one expects to see a Glasgow Coma Scale number in the records. I could find that no such test was even conducted." (Id. at 14.)*

Domokos challenges these three opinions as "demonstrably untrue" because

Mr. Sands admitted in his deposition that these opinions were mistaken (*i.e.*, that he

overlooked documents in the record contrary to these opinions). (ECF No. 90 at 6.)

Shelter does not respond to this argument and the Court therefore deems Shelter to

confess it. Accordingly, the Court sustains Domokos's objection to these opinions.

## C. Opinions Challenged as Irrelevant

*1. "This is all inconsistent with a demand letter from her layer dated June 27, 2017 in which he stated that Ms. Domokos experienced a 'most debilitating' traumatic brain injury after her head 'smashed into the steering wheel.' I could find nothing in the medical records to support the assertion by counsel that Ms. Domokos' head smashed into the steering wheel or hit anything other than an airbag. . . . That is inconsistent with Mr. Zaner's statement that Ms. Domokos' head smashed into the steering wheel." (ECF No. 90-1 at 13.)*

*2. With regards to a subsequent accident on January 4, 2016, asserting that "[t]his reporting is not consistent with either prior reporting and treatment or later reporting and treatment." (Id. at 15.)*

*3. "Medical providers are highly dependent upon accurate histories given by their patients. Ms. Domokos' reporting appears, at times, to have been inconsistent." (Id. at 16.)*

Domokos challenges these opinions for essentially the same reasons as the

medical opinions challenged above, *i.e.*, they have no connection to Shelter's behavior

and are therefore irrelevant. (ECF No. 90 at 7–10.)[5]  Shelter responds that, "to the

extent there are any inconsistencies in or with the records provided [to Shelter by

Domokos or her attorneys], that is certainly information and insurer may fairly consider

---

[5] Indeed, opinion 3 here is the same as opinion 7 in Part V.A, above.

in evaluating the claim and is thus relevant to whether its conduct in handling the claim was consistent with industry standards." (ECF No. 93 at 4.)

Again, the problem with Mr. Sands's opinions (and Shelter's argument in support of them) is that Mr. Sands never links these opinions to something Shelter's agents did or said, nor to an industry standard supporting Shelter's actions or words under the circumstances. Accordingly, the Court sustains Domokos's objection to these opinions.

## D. Opinions Challenged as Improper Legal Opinion

Domokos generally objects that "Mr. Sands could not reach a legal conclusion, testify to the state of the law, or invoke 'Colorado law' to bolster his opinions, particularly when he blatantly misrepresents the law." (ECF No. 90 at 10.) In light of the Court's observations in Part III, above, there is no *per se* rule prohibiting a bad faith expert from invoking legal authorities to the extent they inform the expert's understanding of insurance industry standards. The Court further holds that, so long as the conclusions the expert draws from those authorities are within the realm of reasonable interpretation and extrapolation, those conclusions are a matter for cross-examination, not exclusion under Rule 702.

Domokos raises only two specific challenges to purported improper or inaccurate legal opinions. First, at his deposition, Mr. Sands opined that insurers' "internal standards" (such as claims-handling manuals) are not competent evidence to support a bad faith claim. (*See* ECF No. 90-3 at 10.) He testified that part of his support for that opinion was a "recorded opinion" (*i.e.*, a published decision) from a case he litigated, "Olson versus State Farm" (*id.* at 8), referring to *Olson v. State Farm Mutual Automobile Insurance Co.*, 174 P.3d 849 (Colo. App. 2007). According to Mr. Sands, the *Olson* case "says that . . . internal materials . . . do not support a bad faith claim." (ECF

No. 90-3 at 8.)  Domokos says that "this is an inaccurate summary and gross overgeneralization of *Olson*'s holding."  (ECF No. 90 at 11.)

The Court first notes that Domokos is challenging an opinion solicited in the course of deposition, not one contained in Mr. Sands's expert report.  It is thus unclear whether Mr. Sands intends to offer this opinion.  However, to the extent Domokos intends to cross-examine Mr. Sands in a way that will likely elicit the same opinion, the Court finds that his interpretation of *Olson* is not within the realm of reasonable interpretation and extrapolation.

The plaintiff in *Olson* claimed that his insurance company acted in bad faith by failing to inform him of the statute of limitations that would apply if the plaintiff intended to file a lawsuit disputing the insurer's coverage decision.  174 P.3d at 852, 856–57. The plaintiff grounded this claim in, among other things, language from the insurer's "claims manual" that supposedly created a duty to inform the insured of the statute of limitations.  *Id.* at 857.  But the language from the claims manual on which the plaintiff relied was generic language about prompt, good faith service to the policyholder.  *Id.*  It said nothing about a commitment to inform insureds of the statute of limitations, and the Court of Appeals would "not read such a duty into language that does not expressly create it."  *Id.*

The Court of Appeals then noted an additional reason why the plaintiff's claim failed:

> Further, the insured has not provided any information to establish that (1) the claims manual was incorporated into the insurance contract, (2) the insurance contract was ambiguous about the obligations the insurance company was required to perform, or (3) the manual was necessary to establish the intent of the parties.  Without such a

> connection, the insured has not established that the claims
> manual created a legal obligation that would serve as the
> basis for a breach of contract claim.

*Id.* The court's reference to "a breach of contract claim" creates some uncertainty about whether the court was still analyzing bad faith—perhaps discussing it more generically as "breach of contract" (because bad faith ultimately goes back to the contractual claim of a breach of the covenant of good faith and fair dealing). Regardless, the principles *Olson* establishes as to claims manuals are clear enough: if the plaintiff wants to hold the insurance company responsible for an obligation it allegedly took on by way of its claims manual, it must be a specific obligation, and the claims manual must be incorporated into the insurance contract, or be needed to resolve an ambiguity in the insurance contract, or be otherwise necessary to establish the parties' intent.

In this light, *Olson* is not about whether claims manuals can provide evidence of industry standards, but whether the defendant's claims manual can create specific, enforceable obligations beyond the words of the insurance policy. Thus, Domokos's objection is sustained to the extent she argues that Mr. Sands should be prevented from testifying that *Olson* establishes the proposition that internal claims manuals cannot be evidence of industry standards.[6]

Domokos's second challenge to Mr. Sands's interpretation of case law revolves around *Sanderson v. American Family Mutual Insurance Co.*, 251 P.3d 1213 (Colo. App. 2010), another case that Mr. Sands litigated. Mr. Sands relies on *Sanderson* in a

---

[6] The Court recognizes that Mr. Sands, as one of the attorneys participating in the *Olson* case, likely has a broader view of the issues at stake there. However, the Court of Appeals' published decision is the only thing that might qualify as "objective[] [evidence of] industry standards," *Allen*, 102 P.3d at 343, and that published decision does not stand for what Mr. Sands represents it to stand for.

rebuttal report, specifically contesting Mr. Allen's opinion that Shelter violated an industry standard by failing to explain its settlement offers.  (ECF No. 90-2 at 3.)  As Mr. Allen acknowledges, Shelter *did* give an explanation of its final settlement offer (although no previous offer), stating that the medical records showed doubt about whether her stutter was related to the accident, and also stating that some of Domokos's injuries may have been caused by a later accident.  (ECF No. 89-1 at 4–5.)  Nonetheless, Mr. Allen criticizes Shelter as follows:

> By failing to explain its offers . . . and by failing to explain how it arrived at its offers, Shelter created a situation where the insured had to bring suit in order to attempt to determine the nature, substance and details of Shelter's offers and payment.  Shelter's refusal to explain its offer also created a situation where there could be no meaningful discussion of the offer, no identification of defects in the offer, and no ability to reach a compromise or a reasonable settlement of the claim.

(*Id.* at 14.)  This opinion is apparently grounded in a portion of the UCSPA which states that "[f]ailing to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement" is an unfair claims settlement practice.  Colo. Rev. Stat. § 10-3-1104(1)(h)((XIV).  (*See also* ECF No. 89-1 at 4, 7 (citing or alluding to this portion of the UCSPA).)

In his rebuttal report, Mr. Sands responds in his rebuttal report as follows:

> [Mr. Allen] cites no authority that establishes a standard by which he measures Shelter's conduct.  Suffice it to say that in Colorado, the only guidance as to any industry-standard applying to explanations of the basis for calculations is found in the *Sanderson* case.  I handled that case through appeal.  The "inadequate explanation" argument was made and rejected in that case.  In so far as relevant here, the Court found that a general explanation suffices.  There is no standard that requires more detail that Mr. Allen seems to

> suggest is required.  His opinion is based upon nothing more
> than his own standards, not objective standards created by
> relevant authorities.

(*Id.*)  Unlike *Olson*, the Court finds that Mr. Sands's interpretation of *Sanderson* is within the realm of reasonable interpretation and extrapolation.

The plaintiff in *Sanderson* demanded arbitration with his UIM insurer "to resolve the disagreement regarding either damages or the liability of the underinsured driver [that struck the plaintiff]."  251 P.3d at 1215.  While the arbitration demand was pending, but before the parties actually appeared before an arbitrator, the plaintiff demanded his policy limits ($75,000) and the insurance company countered at $30,000.  *Id.* at 1215–16.  As summarized by the Court of Appeals, the insurance company (referred to as "AFI") explained its counteroffer as follows:

> (1) Sanderson had suffered no loss of past or present
> income as a result of the accident, (2) he had a preexisting
> degenerative neck condition, and (3) AFI had paid all of his
> medical expenses to date through his Personal Injury
> Protection (PIP) coverage and would pay his future medical
> expenses until five years after the date of the accident or the
> PIP policy limits were exhausted.

*Id.* at 1216.  Eventually the parties appeared before an arbitration panel that awarded well in excess of the plaintiff's policy limits, prompting the insurer to promptly pay those limits, with interest.  *Id.*  The plaintiff then filed suit, claiming that the insurer had adjusted the claim in bad faith.  *Id.*

Among the plaintiff's bad faith arguments was that the insurer "made a low settlement offer of $30,000, [and] never explained the basis for that offer."  *Id.* at 1219.  As to that, the Court of Appeals affirmed the trial court's award of summary judgment to the insurer, reasoning as follows:

> [W]ith respect to Sanderson's argument that AFI's failure to explain its $30,000 offer showed bad faith, as noted above, AFI had no duty to negotiate at all during the arbitration. Accordingly, we question the basis for Sanderson's argument that AFI had a duty to explain an offer that it voluntarily chose to make. In any event, contrary to Sanderson's assertions, AFI did explain its offer, referencing the PIP offset issue, Sanderson's pre-existing degenerative neck condition, and the lack of damages for any loss of past or present income. The fact that Sanderson did not agree with this explanation does not support a bad faith claim.

*Id.* at 1221 (citation omitted).

Although *Sanderson* does not specifically address the portion of the UCSPA requiring a reasonable explanation of settlement offers, it is nonetheless a fair extrapolation of *Sanderson* that explanations of settlement offers usually do not need much detail. Moreover, an opinion to the effect of, "In light of *Sanderson*, it has become an industry standard that explanations of settlement offers need not be particularly detailed," does not "encroach upon the trial court's authority to instruct the jury on the applicable law," *Specht*, 853 F.2d at 807, because the jury will still be tasked with deciding whether Shelter acted reasonably under the specific circumstances of the case. A jury would remain free to conclude, for example, that Mr. Allen's opinions about the level of detail needed are persuasive in light of the specific facts Shelter knew at the time it adjusted the claim.

Thus, Mr. Sands's reliance on *Sanderson* is a matter for cross-examination, not exclusion under Rule 702. This objection is therefore overruled.

## VI. CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1. Shelter's Motion to Exclude Testimony of Plaintiff's Expert Garth Allen Pursuant to F.R.E. 702 (ECF No. 89) is GRANTED IN PART and DENIED IN PART, as

stated above; and

2.  Domokos's Motion to Exclude Testimony by Defendant's Expert Jon F. Sands at Trial (ECF No. 90) is GRANTED IN PART and DENIED IN PART, as stated above.

Dated this 21st day of February, 2020.

BY THE COURT:

_____
William J. Martinez
United States District Judge